475 So.2d 439 (1985)
R.S. CLAYTON, M.D.
v.
Michael B. THOMPSON.
No. 54711.
Supreme Court of Mississippi.
August 28, 1985.
Rehearing Denied September 25, 1985.
*441 Stanley F. Stater, III, Christopher & Stater, C.R. Montgomery, Montgomery & Smith-Vaniz, Canton, John H. White, Jr., McComb, for appellant.
V. Douglas Gunter, Jackson, for appellee.
En Banc.
PRATHER, Justice, for the Court:
The subject matter of this appeal is medical malpractice in which the plaintiff relies upon the theory of "loss of a chance" of "greater" recovery.
This medical malpractice suit was filed by Michael B. Thompson against R.S. Clayton, M.D., in the Circuit Court of Pike County. The jury awarded Thompson $75,000 damages. The circuit court granted a remittitur in the amount of $40,000 and, following acceptance of the remittitur, entered final judgment against Dr. Clayton in the amount of $35,000.
Clayton appeals assigning as error:
(1) The trial court erred when it qualified Dr. Hugh Robertson as an expert witness in the field of Diagnostic Radiology;
(2) The trial court erred in failing to grant the motion of appellant Clayton for a directed verdict;
(3) The trial court erred in overruling the motion of appellant Clayton for a new trial on the issue of liability;
(4) The jury verdict of $75,000 and the trial court's final judgment of $35,000 are excessive and evidence extreme bias and prejudice against appellant Clayton by the jury in the trial court;
(5) The trial court erred in failing to grant appellant Clayton's requested peremptory instruction; and in granting an instruction on behalf of the appellee regarding his theory of the case.
Thompson cross-appeals assigning as error:
(1) The trial court erred in granting a new trial as to damages unless the plaintiff accepted a remittitur of $40,000.

I.
On July 8, 1979, appellee Michael Thompson of McComb injured his thumb while playing in a softball tournament.
The following day, Thompson went to see his family physician, Dr. John Boyd, who referred Thompson to the Southwestern Regional Medical Center for x-rays. The appellant, Dr. R.S. Clayton, chief radiologist at Southwest Medical Center, examined and interpretated x-rays of appellee Thompson's thumb and concluded in his written report that the x-rays revealed "no evidence of a fracture or dislocation."
Dr. Boyd, relying on his visual examination of Thompson's thumb and the findings of Dr. Clayton, diagnosed Thompson's injury as a "sprained thumb", prescribed medication for pain and recommended hot soaks.
Approximately four months later, on November 19, 1979, appellee Thompson returned to Dr. Boyd complaining of continued problems with his thumb. Dr. Boyd again referred Thompson to the Southwest Regional Medical Center for x-rays. At this time, Dr. Clayton found that the x-rays indicated a fracture of the metacarpal phalangeal joint (joint connecting thumb to hand). Based on this report, Dr. Boyd referred Thompson to Dr. Wm. H. Meyer, an orthopedic surgeon. On January 18, 1980, Dr. Meyer performed surgery upon Thompson to repair the torn ligament of the metacarpal phalangeal joint. Two stainless steel pins were drilled into the bone of the thumb and placed across the joint to hold it in place while the ligaments healed. Very little mobility was recovered in the joint *442 where the ligament reconstruction was attempted and, over the next several months, Thompson continued to complain of pain. On March 23, 1981, Dr. Meyer performed a second operation in order to fuse the joint of Thompson's thumb.
As a result of the surgical fusion, Thompson can no longer bend the thumb joint. At trial, Dr. Meyer described Thompson's injury as permanent, with a resulting disability of 50 percent impairment to the thumb and 25 percent impairment to the hand. Dr. Meyer further testified that the chance of a more reasonable function of the thumb would have definitely been better if he had seen Thompson in July of 1979 rather than November of 1979.
Dr. Hugh Robertson, associate professor of radiology at Louisiana State University School of Medicine was qualified as an expert and testified on behalf of appellee Thompson at trial. Dr. Robertson testified that his examination of the July 9, 1979 x-rays revealed three separate fragments of bone around the metacarpal phalangeal joint of the thumb. According to Dr. Robertson, the presence of the three fractures would be critical to a treating physician, and the diagnosis of Dr. Clayton, by its failure to mention these fractures, deviated from the average standard care applicable to radiologist.
Dr. James M. Packer, a Jackson radiologist, was qualified as an expert and testified on behalf of the defendant that he found no fractures on the July x-rays of Thompson's thumb. Dr. John G. Caden, an orthopedic surgeon from Jackson, was qualified as an expert and testified for the defendant that no fractures or fragments of bone were visible in the July x-rays. Dr. Kenneth G. Carter, a Jackson radiologist, was qualified as an expert and testified for the defendant that he found nothing in the July x-rays that he would call a fracture. Carter, however, admitted that in a letter dated August 6, 1981, he stated that a review of the July x-rays revealed a tiny density overlying the first metacarpal head which "could represent a small cortical evulsion or might be nothing more than a film artifact." Dr. Carter explained that a cortical evulsion is a tiny splinter of bone which could be called a fracture.

II.
Did the trial court err in qualifying Dr. Hugh Robertson as an expert in the field of diagnostic radiology?
Appellant objected at trial to the qualifications of Dr. Hugh Robertson as an expert in the field of diagnostic radiology based upon his absence of any familiarity with the standard of care applicable for a radiologist in McComb, Mississippi. The trial court overruled this objection and appellant assigns this ruling as error, relying on King v. Murphy, 424 So.2d 547 (Miss. 1982).
In the recent case of Hall v. Hilbun, 466 So.2d 856 (Miss. 1985) this Court stated that every doctor "has a duty to use his or her knowledge and therewith treat through maximum, reasonable, medical recovery, each patient, with such reasonable diligence, skill, competence, and prudence as are practiced by minimally competent physicians in the same specialty or general field of practice throughout the United States, who have available to them the same general facilities, services, equipment and options." This Court held that a qualified medical expert witness may express an opinion regarding the meaning and import of the above duty of care given the peculiar circumstances of the case. The national standard of care announced by this Court in Hilbun contains a "resources-based caveat", that is, the duty of care is based upon the use of such medical facilities, services, equipment and options as are reasonably available. In the case sub judice, there was no suggestion that the x-ray facilities and equipment available to Dr. Clayton at Southwest Medical Center were in any way more limited than that available in other areas of the country.
Hall reaffirmed our general rule that a qualified expert witness may testify in cases where scientific or technical knowledge will be of assistance to the trier of the facts in determining a fact in issue. Hall, *443 supra, at 873. Obviously, medical malpractice cases generally require expert witnesses to assist the trier of the facts to understand the evidence. Kilpatrick v. Mississippi Baptist Medical Center, 461 So.2d 765, 768 (Miss. 1984).
It is apparent from this record that Dr. Robertson is in fact "qualified as an expert by knowledge, skill, experience, training or education." Hall, at p. 873; Hardy v. Brantley, 471 So.2d 358, 366 (Miss. 1985). He was familiar with the x-ray equipment and facilities available to Dr. Clayton.
In light of this Court's decision in Hall v. Hilbun, supra, which was expressly made retroactively applicable to "any case in which an appeal is pending and in which the issue has been preserved ...", qualification of Dr. Robertson as an expert in the field of diagnostic radiology was proper and appellant's first assignment of error is without merit. See Hardy v. Brantley at 366.

III.
Did the trial court err in failing to grant appellant's motion for a directed verdict?
Appellant contends that the testimony of appellee's own orthopedic surgeon, Dr. William Meyer, so contradicted that of appellee's expert witness, Dr. Robertson, as to require a directed verdict for the appellant. At trial, Dr. Meyer testified that, while performing surgery on appellee's thumb, he did not observe any fractures in the area. The testimony of Dr. Meyer, an orthopedic surgeon, regarding his observations during surgery would not therefore negate the testimony of appellee's duly qualified expert in the field of diagnostic radiology.
In determining whether to grant a directed verdict, "the Court must look solely to the testimony in behalf of the party against whom the directed verdict is requested and consider that testimony as true along with all inferences which could be drawn therefrom favorable to such party, and if such evidence could support a verdict for him, the directed verdict or peremptory instruction should not be given." Gates v. Murphree, 286 So.2d 291, 292 (Miss. 1973). Hall v. Hilbun, supra, at 883.
The trial court was of the opinion that Dr. Robertson's testimony created a jury issue on the question of defendant's liability. This Court has recognized that the trial judge's determination of whether or not a jury issue is tendered is entitled to great respect on appeal. City of Jackson v. Locklar, 431 So.2d 475, 479 (Miss. 1983).
This assignment of error is without merit.

IV.
Did the trial court err in overruling defendant's motion for a new trial on the issue of liability?
Appellant offers no legal authority but simply submits that "by ordering a new trial on all issues in this case the trial court would have exhibited good judgment from the standpoint that throughout the entire proceedings there was only one witness, Dr. Hugh Robertson, who found fault with the work of the appellant." Appellant's argument here ignores the testimony of defense witness Dr. Carter, who conceded that a pretrial review of the July 9, 1979 x-rays of Thompson's thumb revealed a "tiny density" which "could represent a small cortical evulsion". This cortical evulsion, which Dr. Carter admitted could be called a fracture, was in the same area where appellee's expert, Dr. Robertson, observed fractures.
The granting or denial of a new trial in a civil case is a matter committed to the sound discretion of the trial judge. Such motions should be granted sparingly and only when the trial judge is convinced that the jury has wholly departed from its oath to follow the law and has been actuated by bias, passion and prejudice. Jesco, Inc. v. Whitehead, 451 So.2d 706, 714-716, (Miss. 1984); Beard v. Williams, 172 Miss. 880, 884, 161 So. 750, 751 (1935).
We find no basis for holding that the trial judge abused his discretion in this *444 regard and thus conclude that this assignment of error is without merit.

V.
Was the jury's verdict of $75,000 and the trial court's final judgment of $35,000 against the overwhelming weight of the evidence and so excessive as to evidence extreme bias and prejudice?
Appellant argues that the final judgment of $35,000 has no reasonable relationship to the facts of this case in light of the fact that appellee's total medical expenses were $30,125.14.
This Court generally will not vacate or reduce a damage award unless it is so "out of line as to shock the conscience of the court". City of Jackson v. Locklar, 431 So.2d 475, 481 (Miss. 1983).

VI.
Did the trial court err in refusing to grant appellant's requested peremptory instruction and in granting appellee's requested instruction P-28?
Appellant contends that a peremptory instruction should have been granted because plaintiff's case rested entirely upon the theory that an earlier referral to an orthopedic surgeon would have resulted in a greater chance for more flexibility of the thumb. Appellant argues that a "chance" of a better result is not a sufficient causal connection to justify imposition of liability in a medical malpractice case. Since these last two assignments of error deal with the same substantive issue, they will be addressed jointly.
The instruction granted to the appellee covering his theory of the case is as follows:
The Court instructs the jury that if you find by a preponderance of the evidence that defendant Dr. R.S. Clayton made an incorrect finding on the July 9, 1979 x-ray film of Plaintiff Michael B. Thompson, and you further find from the preponderance of the evidence that such an incorrect finding, if any, by Defendant, Dr. R.S. Clayton was a result of negligence under all the circumstances of this case and that Dr. John Wood Boyd used reasonable care in relying upon Dr. R.S. Clayton's report did not refer the plaintiff to the immediate attention of an orthopedic surgeon and if you further find from the preponderance of the evidence that immediate attention by an orthopedic sureion [sic] would probably have given Michael B. Thompson a good chance to recover greater flexibility of his left thumb, then you must find for Plaintiff Michael B. Thompson.
The plaintiff's theory of his case was as follows:
(1) That Dr. Clayton was under a duty to use minimally sound medical judgment in his reading of the plaintiff's x-rays, consistent with the level of expertise the doctor holds himself out to possess and consistent with the circumstances of the case, recognizing that the doctor is not liable per se for a mere error of judgment, mistaken diagnosis or occurrence of an undesirable result. Hall v. Hilbun, 466 So.2d 856 (Miss. 1985).
(2) That Dr. Clayton failed to provide the required level of care by falling below objectively ascertainable minimally acceptable levels of competence in the interpretation of the x-rays, which failure constituted negligence.
(3) That Dr. Boyd, the general practitioner used reasonable care in relying upon Dr. Clayton's report and not referring the plaintiff to the immediate attention of an orthopedic surgeon.
(4) That permanent damage resulted to the plaintiff's thumb and hand as a whole which was proximately caused by the breach by Dr. Clayton of his duty.
(5) And that immediate medical attention by an orthopedic surgeon immediately following the x-ray examination by Dr. Clayton would "probably" have given the plaintiff a "good chance" to recover "greater flexibility of his left thumb."
This theory of recovery has been termed the "loss of a chance" or "value of a chance." Our Court has not addressed the *445 theory before. The appellant raises the question here and asserts that the theory should not be accepted into our law because it falls short of requiring a causal connection between malpractice on the part of the physician and injury to the patient. See Dazet v. Bass, 254 So.2d 183 (Miss. 1971); Hall v. Hilbun, supra. Appellant particularly challenges the instruction in two aspects, (1) absence of the requisite casual connection, and (2) inadequacy of guideline in jury's deliberation as to the measure of the injury.
There was also evidence which, if believed by the jury, would establish that the erroneous diagnosis of Dr. Clayton was the proximate cause of the injury. This Court notes that proximate cause arises when the omission of a duty contributes to cause the injury. Gardner v. National Bulk Carriers, Inc., 310 F.2d 284, (4th Cir.1962) cert. denied, 372 U.S. 913, 83 S.Ct. 728, 9 L.Ed.2d 721 (1963). Harvey v. Silber, 300 Mich. 510, 2 N.W.2d 483 (1942). "Proximate cause here is implicit in the breach of duty. Indeed, the duty would be empty if it did not itself embrace the loss as a consequence of its breach." Gardner, supra, at page 287.
This Court first observes that instruction P-28 only impliedly addresses proximate cause, but that two other granted instructions more than adequately cover the law on this point. Repeatedly, this Court has held that each instruction does not necessarily have to cover every element of the theory of the case, but that it is sufficient that all instructions, when read as a whole, inform the jury as to the law of the case. Cotton v. Quinn, 245 So.2d 593 (Miss. 1971); Ideal Cement Co. v. Killingsworth, 198 So.2d 248 (Miss. 1967). In this case instructions given on proximate cause sufficiently instruct the jury, although instruction P-28 only impliedly addresses the issue.
Addressing now the adequacy of guidelines of this instruction, the language contained within the instructions which channels the jury's consideration of the measure of the injury says "a good chance" of "greater recovery." Other jurisdictions that have addressed this theory of recovery have permitted recovery for loss of a "reasonable possibility" (Gardner, supra) or "probability that an operation would have saved decedent's life". (Harvey, supra).
This Court recognizes that the plaintiff is rarely able to prove to an absolute certainty what would have happened if early treatment, referral or surgery had happened. "The law does not ... require the plaintiff to show to a certainty that the patient would have lived had she been hospitalized and operated on promptly." Harvey, supra. Having in mind this reality, our approach to the requirement of causation in medical malpractice cases necessarily differs from that employed in most other tort contexts.
This Court concludes that the language of this instruction invited impermissible speculation and conjecture by the jury. The jury's deliberation should have been channeled to consider a substantial probability, rather than a "good chance," to recover substantially greater flexibility of his thumb.
This Court concludes, therefore, that Mississippi law does not permit recovery of damages because of mere diminishment of the "chance of recovery". Recovery is allowed only when the failure of the physician to render the required level of care results in the loss of a reasonable probability of substantial improvement of the plaintiff's condition. This instruction, therefore, must fail for its failure to properly guide the jury.
For this reason, this Court concludes that the jury verdict must be reversed and the case remanded for new trial under proper instruction.
As the judgment is being set aside for retrial, we do not address the cross-appeal.
REVERSED AND REMANDED FOR A NEW TRIAL.
PATTERSON, C.J., ROY NOBLE LEE, P.J., and HAWKINS, ROBERTSON, SULLIVAN and ANDERSON, JJ., concur.
*446 HAWKINS, J., specially concurs.
WALKER, P.J., dissents with opinion.
DAN M. LEE, J., dissents.
WALKER, Presiding Justice, dissenting:
I respectfully dissent from the holding of the majority remanding this case to the lower court for a new trial. Dr. Clayton should have been granted a peremptory instruction absolving him from any liability with respect to Thompson's injuries.
I fully agree with Justice Hawkins' analysis of the case found in his specially concurring opinion, except where he feels that the case should be remanded for a new trial. I am of the opinion that Dr. Clayton is entitled to have the case rendered in his favor in this Court and not subject him to further expensive litigation.
The action of the majority simply gives Thompson a second "bite at the apple" and is a miscarriage of justice.
HAWKINS, Justice, specially concurring:
I concur in remand for the reasons stated in the majority opinion. This case has a much more serious problem, however; the verdict is against the overwhelming weight of the evidence.
In my view the proof of Dr. Clayton's failure to properly evaluate the x-ray films is overwhelmingly disputed. Further, any such relation to plaintiff's subsequent problems is absurdly improbable, while proof to the contrary is overwhelming. While plaintiff's case is perhaps sufficient to barely withstand a directed verdict or j.n.o.v., the proof that Dr. Clayton exercised the commensurate standard of care of a physician in his specialty, and that his conduct had nothing to do with plaintiff's problem is indeed overwhelming.
The standard of appellate review for the determination of whether a verdict is against the overwhelming weight of the evidence is set out in dozens of our decisions, known to every judge and practicing lawyer. Nothing will be served in lengthening this opinion with supporting decisions. The reader will best be served by detailing the facts, supported by basic medical knowledge about the human anatomy, to show just how weak a case the plaintiff presented.

FACTS
On July 8, 1979, Michael B. Thompson was a thirty-year-old man, employed by a soft drink bottling company as a vending machine mechanic. On that day he was playing softball and injured his left thumb when he and a fellow player collided. Thompson was right-handed, played short-stop on the team, and wore the glove on his left hand. Ray Miller, teammate and pitcher, saw the thumb was dislocated so he "pulled it straight out as I could and then let it go and then it just popped back into place from the way it looked." Thompson finished the game.
The next day, July 9, he went to see John Boyd, M.D., a general practitioner in McComb. The thumb area was swollen, Dr. Boyd took a history, and sent Thompson to the local hospital, Southwest Regional Medical Center (Southwest) for an x-ray. R.S. Clayton, M.D., the defendant, was staff radiologist for the hospital. Three radiographs (x-ray films) of the hand were made on July 9, and following his examination of them, Dr. Clayton made the following report:
LEFT HAND
Three views of the left hand with special attention to the thumb show no evidence of acute fracture or dislocation. Soft tissue swelling is apparently around the metacarpal phalangeal articulation.[1]
Dr. Boyd received the report by telephone, diagnosed Thompson as having a *447 sprained thumb, and prescribed phenargen [sic] (phenaphen) number three, a pain medication. He testified he told Thompson to take the medicine, use some heat and take it easy, and if it didn't get better to return.[2]
Thompson continued to work. Although he testified he favored the thumb, his job entailed considerable physical activity. At the county fair, for instance, he was required to lift cans of syrup weighing 40-50 pounds some 40 or 50 times a day. There is no evidence he reduced his softball activities. In fact, he played at least one full game in a tournament held later in Greenville.
Thompson did not return to Dr. Boyd until November 19, 1979, at which time he complained he was having problems with his thumb. Dr. Boyd again ordered x-rays from Southwest. Four x-ray films were made. Dr. Clayton examined or "read" them and made the following report:
LEFT THUMB
Four views of the left thumb show fracture of the corner of the proximal end of the proximal phalanx of the thumb and subluxation of the metacarpo-phalangeal articulations.
Comparison views of the right metacapo-phalangeal articulations show normal findings. Films sent with patient to Dr. Boyd.[3]
There had been no dislocation or fracture observed by Dr. Clayton in the July 9 x-ray films.
Upon receipt of this report, Dr. Boyd referred Thompson to William H. Meyer, M.D., an orthopedist in McComb. Dr. Meyer diagnosed a torn ligament in the joint which he felt would require surgical repair, although he was dubious about the success of such operation, and so informed Thompson.[4] On January 18, 1980, Dr. Meyer did attempt to make a surgical repair of the ulnar collateral ligament (ligament toward centerline of thumb) and also reduced the subluxation of the joint with two small pins. The hand was put in a cast.
Dr. Meyer continued to see and treat Thompson on the following subsequent dates: February 2, 25, March 17, and April 28, 1980. He hoped to get by without fusing the bones at the joint. Following the April visit, he did not see Thompson again that year. On March 17, 1981, Thompson returned, informing Dr. Meyer he had been seen by another doctor who felt he would need a bone fusion. Dr. Meyer reached the same conclusion, and on March 22 performed surgery which would fuse the metacarpal and first phalanx at the joint. This surgery would enable the joint to be stable, but also render it immobile.
Thompson filed suit against Clayton and Southwest on July 7, 1981. He did not sue Dr. Boyd. At trial the basis of his claim against Clayton and Southwest as respondent superior was the contention that Dr. Clayton negligently failed to note and then inform Dr. Boyd of three fractures around the joint, from the x-ray films taken July 9, which indicated that the ligaments around the joint had been torn.
Seven doctors testified at the trial. The following testified for Thompson:
Dr. Boyd, the general practitioner.
Dr. Meyer, a board certified orthopedist.
Dr. Hugh F. Robertson, a Canadian radiologist, educated in Canada, who moved to the United States in 1968, and was practicing in New Orleans at the time of trial. Dr. Robertson had obtained the equivalent of board certification in Canada, and had taken the examination for the American Board of Radiology. He had been a professor in radiology in several renowned medical universities in the United States.
The following doctors testified for Clayton:
Dr. Clayton, a board certified radiologist, who also had taught radiology, and had a distinguished career in his field.

*448 Kenneth G. Carter, M.D., a board certified radiologist, practicing and teaching in Jackson.
James M. Packer, M.D., a board certified radiologist practicing in Jackson.
John G. Caden, M.D., a board certified orthopedist practicing in Jackson.
Dr. Robertson was the only witness who testified Dr. Clayton had failed to properly interpret the July 9, 1979, x-ray films. He testified there were three bone fragments around the joint which Dr. Clayton failed to note, which indicated ligaments had been torn at the joint. All the doctors' testimony will be analyzed below.
All doctors agreed there was no subluxation of the joint shown in any of the July 9, 1979, x-ray films.

MEDICAL OBSERVATIONS
In making an accurate analysis of the proof of negligence in this case, precision and clear understanding of medical terms and procedures are necessary.
The entire case against Dr. Clayton is based on his evaluation, interpretation, or "reading" of three x-ray films taken July 9, 1979. These films do clearly outline a considerably ballooned-out area around the joint, indicating swelling.
Based upon Dr. Clayton's report, his own limited clinical examination and the history, Dr. Boyd diagnosed Thompson as having a sprained thumb.

SPRAIN
First, then, what does a "sprain" mean to a physician?
Dorland's Medical Dictionary defines a sprain as a joint injury in which some of the fibers of a supporting ligament are ruptured but the continuity of the ligaments remain intact.
Stedman's Medical Dictionary defines a sprain as an injury to a joint, with possible rupture of some of the ligaments or tendons, but without dislocation or fracture.
The joints of the human anatomy permitting free movement are synovial joints. Such a joint (as Thompson's thumb joint) is enclosed in a fibrous capsule and contains fluid for lubrication. Attached to the bones at the joint are ligaments. Ligaments, unlike muscles, cannot move the adjoining bones at the joint. Instead, they protect the joint by permitting movement in the way nature has designed the bones to move at the joint, and preventing an unnatural movement. Thus, the ligaments in the knee prevent its being bent but one way. Ligaments give a joint stability, without which problems develop.
A blow forcing a joint in an unnatural direction stretches the ligament. While a ligament has considerable strength, it has limited elasticity. It does not return to its original size following any significant stretching. Such problems can become serious and quite painful as well as disabling.
Obviously, if the blow has been severe enough to knock the bones at the joint out of alignment, and there has been a dislocation, or subluxation, the supporting ligaments have been substantially stretched and most likely torn, along with a rupture of the capsule enclosing the joint.
In the softball game Thompson sustained a severe stretching and tearing of one or more ligaments in his thumb. This was evident to Dr. Boyd for two reasons: he could tell by looking at it, but especially; he was told in the history of the injury that Thompson gave him that the thumb had been knocked out of place, and a teammate had pulled it back into place. Dr. Boyd could further have determined the severity of the sprain by making certain simple movements of the thumb known to any orthopedist. He did not perform any of these routine tests.
Dr. Boyd sent Thompson to the hospital for x-rays of the thumb to see if there were any broken or fractured bones, and whether there was any dislocation at the joint. He did not need x-rays to tell him that his patient had a substantial sprain.

RADIOLOGIST RESPONSIBILITY
A radiologist is a medical doctor specializing in radiology. He frequently, as did *449 Dr. Clayton, contracts with a hospital to read x-rays taken of patients of referring doctors. He does not take the x-ray films. He is not a treating physician; he does not attempt to administer to or advise any patient. Indeed, quite frequently he never even sees the patient. He does have some responsibility to see that a good x-ray view has been taken and developed. His primary responsibility is to evaluate the developed x-ray films (in accordance with recognized standards of his profession) to determine disease or abnormality.

X-RAYS
Roentgen rays are commonly known as x-rays. Images produced on film by these rays are not photographs. Precisely they are roentgenograms, also technically described as radiographs, but best known as "x-ray films."
When a person examines an x-ray, he is not examining a photograph of the inside of a body, much less "seeing" inside the body. An x-ray machine produces x-rays that have the unusual ability to penetrate solid matter. The degree of penetration depends upon the density of the body: the greater the density, the less penetration. X-rays passing through a body onto a chemically prepared film form an image when the film is processed or developed.
As noted, the more solid or dense the object, the more it absorbs the x-rays. Conversely, the less solid the object, the more easily the x-rays pass on through. In the human body bones and structures containing calcium constitute the densest of barrier to x-rays. Matter with the least density are air and gas. Therefore, when a portion of the anatomy is placed on an x-ray film plate (or "cassette" surface) and an x-ray is taken, the following takes place: The densest part of the anatomy such as the bone offers the greatest resistance and permits the least number of rays to penetrate through onto the film. That part of the film will be the lightest shade. Where no resistance has been encountered the film will be dark. The part offering some resistance, but not that of bone, will give a grayer, or darker shade than the bone, but not completely dark. The x-ray film is a chemical reproduction of the shadows cast by the object being x-rayed onto the x-ray film plate.
In the case of an x-ray film, however, the shadows are light, rather than dark. In this sense an x-ray film is similar to a negative in an ordinary photograph.
If a small piece or material, dirt or lint gets onto the undeveloped film, or the film is slightly crinkled when being developed, or is slightly scratched on the surface, this creates a problem in determining whether or not this was a representation of what was in the body, or a defect in the developed x-ray film. Radiologists call these imperfections which appear on the x-rays film "artifacts."

AREA INVOLVED
The perimeter of the entire area injured in this case is small. The total metacarpal-phalangeal joint and affected adjacent portions of the first phalange and first metacarpal bones was no more than an inch by an inch and a half in size.

FRACTURE AND DISLOCATION
When Dr. Clayton was asked to examine the x-ray films of Thompson's hand, he was looking for fractured bones as well as any dislocation at the joints. Soft tissues such as ligaments and muscles would not show up on an x-ray, and therefore any actual stretching or tearing of such tissues would not be revealed by x-rays. However, dislocation (subluxation) of the bones at a joint will be revealed by x-ray and indicate substantial disruption of the attached ligaments.
A bone may be fractured when it is broken in two or cracked. Dr. Clayton would have been interested in a fracture of this type. Another type of fracture is an "avulsion" fracture caused when a ligament is torn loose from the bone to which it has been attached and carries with it a piece of the bone. It was this last type of fracture Dr. Clayton was charged with negligently *450 failing to detect. Dr. Robertson testified he found three avulsion fractures.
Finally, as above noted, in examining an x-ray you are not "seeing" inside the human body, or even a photograph of the interior anatomy. Some abnormalities in the human anatomy, such as an ordinary broken or displaced bone, are easily seen. Others present enormous difficulty. As to the latter, and this is just such a case, it is not unusual for competent radiologists to reach opposite conclusions reading the same x-rays. The bone fragments would have been minute.

THE X-RAYS
The entire case against Dr. Clayton was the claim that he misread the July x-rays. It is pertinent to note, however, the interpretation these doctor witnesses made of both the July and November films.

THE JULY FILMS
As to the July 9, x-rays films, Dr. Robertson testified he found three separate fragments of bone around the metacarpal-phalangeal joint.
1. A fragment of bone overlying the distal end of the first metacarpal bone, on the ulnar side.
2. A fragment of bone off the dorsal (back) surface of the phalanx next to the metacarpal bone.
3. A fragment on the front of the proximal phalanx adjacent to the joint.
The significance of these fragments to him was that they evidenced a tearing away of the ligaments at the joint. He found it very probable from the x-rays that all the ligaments around the joint had been torn. Also, according to Dr. Robertson, the November films showed the same three avulsion fractures.
Dr. Robertson prepared an illustrated colored drawing of the area involved, and how it was x-rayed, but this was not made an exhibit. Also, while Dr. Robertson stated he saw three bone fragments and pointed to them on the films, it is by no means clear the jury saw them. Manifestly, they were minute. He stated they were difficult to see by an untrained eye. He attempted to illustrate their position by an enlarged view he had drawn on a blackboard, but on objection he was not permitted to testify from the blackboard. It is unfortunate these locations, and these illustrations are not part of the record. Any communication is flawed to the degree that the hearer does not know precisely what the speaker is talking about.
While Dr. Robertson was quite positive there was tearing of the ligaments around the joint by viewing the July 9 films and noting three small fractures, what made him certain of a tearing of the ligaments was the dislocation of the joint shown on the November films.
What did all the remaining doctors testify?
Dr. Clayton found no avulsion fracture was discernible on the July x-ray films. He did find a white streak on one of the films which he identified as an artifact. This did not appear on any of the other July films, or any of the November films. In November the same positions of the hand were x-rayed as in July.
Dr. Clayton said in distinguishing an artifact from pathology of the anatomy, he considered whether the thing observed appeared on any other films, was the margin fuzzy, or did it resemble a fracture which had sharp edges.
To emphasize his contention of the absence of any avulsion fractures or bone fragments appearing on the July films, Dr. Clayton had enlargements or blowups of the injured area on each of the July films, which were made exhibits to his testimony. No attempt was made in cross-examination to point out any of the alleged fragments or fractures which Dr. Robertson stated were shown on the films.
Dr. Meyer, the plaintiff's own witness, testified he could find no evidence of fracture of any kind on any of the July films. He observed a density which he thought was an artifact.
*451 Dr. Meyer saw no fractures when he performed surgery.
Dr. Packer testified he saw no evidence of fracture in any of the July films. He observed a density such as testified to by Dr. Clayton, but said it was an artifact.[5] This anomaly was not discernible on either of the remaining July films, or any of the November films. He could not see any defect in the phalanx or metacarpal, the bones from which such a fragment would have come.
Dr. Caden found no evidence of any kind of fracture on any of the July films or their blowups. He also found a density he called an artifact on one of the July films, which did not appear on any of the November films. He said a fracture of a bone was like a glass when it shatters, the edges of the sliver as well as the bone from which it has been torn were sharp. Also, a bone chip of the size of the "density" he observed would have trabecule (fibers) which would show up as lines on the x-ray film. This anomaly did not. Also, it was in the wrong place to have been a fracture from this injury. The absence of the anomaly on any of the remaining July films further indicated to him it was an artifact.
Dr. Carter as a witness testified no evidence of a fracture could be seen on any of the July films, and except for the swelling they appeared normal. He, too, mentioned a density next to the head of the metacarpal. He was of the opinion it was an artifact for the same reasons given by the other physicians, with the additional reason there was no dislocation shown on the July films.
On cross-examination Dr. Carter conceded he had some time previously examined the July films in his office and had written a report stating that on one of them he saw a density at the metacarpal head 1 x 2 millimeters (about 1/12 x 1/25 of an inch) in size which could represent a small cortical evulsion, and he recommended the patient be checked again in seven to ten days.
As a witness, however, and having again reviewed all x-rays, including the blowups, he agreed with the July 9 x-ray report of Dr. Clayton. He reiterated his testimony that in his opinion the July films showed no fractures, and except for the swelling of the hand, appeared normal. As a witness he had the benefit of the November films for comparison as well as the blowups.
As can thus be noted, at least two of the bone fragments Dr. Robertson testified he perceived were not seen by any other physician. But what about a third bone fragment? Was whatever he saw the same anomaly observed by the other physicians? It appears unlikely because what they saw was not apparent on the November films, and what he claimed to have seen was, according to him, apparent on the November films as well. Drs. Clayton, Carter, Packer, Caden and Meyer all observed an anomaly on one of the July films. All five of these physicians testified this anomaly did not appear on the November films, and all concluded it was an artifact.
While it appears unlikely that any of the three anomalies noted by Dr. Robertson as bone fragments could be observed by any of the remaining physicians, even it were conceded that one out of the three things he saw was what the other doctors saw, it is clear all the remaining five concluded it was an artifact, not bone.

DID THE NOVEMBER FILMS SHOW ANY FRACTURE?
While no negligence was predicated on Dr. Clayton's examination of the November films, it is important to note how the physicians read them.
Dr. Robertson, as noted, testified evidence of the same three fractures he had found on the July films was also on the November films.
*452 Dr. Clayton reported a fracture when he examined the November films at the proximal end of the phalanx. Yet as a witness he was of the opinion that he had "over read" the film, and it was in fact a detached fragment of calcium density caused by the body laying bone or calcium in response to an injury.
Dr. Meyer, the attending orthopedist, was of the opinion this anomaly showed a fracture. However, he noted no fracture when he was doing surgery.
Dr. Carter noted the dislocation also in the November films. As to the "fracture" he thought it could be calcification in the ligament caused by the healing process, or a splinter of bone that had slipped off the corner of the phalanx from the original injury or as a result of re-injury in the four-month interval. He said it could also represent an artifact. He also saw some additional whiteness around the head of the metacarpal which he thought was a healing calcification around the soft tissues of the joint space. He agreed with Dr. Clayton that it could be a fracture, or calcification in the joint capsule from the healing process.
Dr. Packer was not specifically asked whether the anomaly observed in the November films was a fracture or calcification.
Dr. Caden's testimony noted the subluxation or dislocation on the November films and that there was also
... some bone reaction in here secondary to trauma where the tissue is beginning to heal, trying to heal, by secondary ossification. Whenever you have ligaments injured around bones, frequently when ligaments are injured around bones, the bone has a tendency to react to that and grow out new bone in a sense to repair it and reattach it. [Vol. IV, p. 481]
The point of this exercise as to the November films is to show how even skilled specialists can disagree on a spot of such small size and appearances on an x-ray film.

WHERE WAS DR. CLAYTON AT FAULT?
Every other doctor who read the July films knew something very significant which Dr. Clayton did not know when he made his July 9 report. Every other doctor, including Robertson, knew Thompson's history of having sustained a blow so severe that his thumb had been knocked out of place. This lack of information was particularly deceptive to Dr. Clayton. He was led to believe the injury was not severe enough to knock the thumb out of place, when in fact it was.
Every other doctor knew the thumb had been dislocated in the original injury. Every other doctor knew he was looking at an x-ray of what in truth and fact had been a substantial sprain, regardless of what the x-ray films showed.
The question is not whether Dr. Robertson actually saw evidence of three bone splinters on the July films to which he testified. There is absolutely no way this question can ever be answered. Five physicians of equal skill of Dr. Robertson positively testified they were not there. And, there is nothing about these films which will ever answer the question for sure, one way or another. Three spots, probably none of which was as much as a tenth of an inch in size, hardly add to certainty.
The question is whether Dr. Clayton can be faulted for not seeing what Dr. Robertson claims he should have seen on July 9.
When four other highly skilled specialists, engaged in daily practice in this state, after deliberate study of these x-ray films, knowing they were going to testify under oath, could see none of them, how can Dr. Clayton be said to have breached the standard of care he owed Thompson?
Furthermore, Dr. Clayton had the particular areas on the films blown up and dared the world to find the bone fragments. Thus far, no one has pointed them out where a layman can see them on the film.
Finally, and most conclusively, Dr. Meyer performed two surgical procedures on this joint on January 18, 1980, and March *453 22, 1981. As opposed to an x-ray film, he did see inside the thumb, and in neither surgical report did he note anything about any fracture. Then, as a witness, he testified he saw no sign of fracture while performing surgery. If Dr. Robertson were correct, it is inconceivable Dr. Meyer would not have noted signs of bone fragments of a deformed bone in the thumb when he was performing surgery.
If this were all we had in this case, I would have to conclude that the overwhelming weight of the evidence showed Dr. Clayton made a professionally competent examination of the July 9 x-ray films.

BUT THIS IS NOT ALL

Coup de grace
Even if we conceded there were splinters of bone which were not noted by Dr. Clayton, what effect would it have made in Dr. Boyd's, or any doctor's, treatment had he been informed of them?
Returning to what happens to the anatomy when there has been a sprain severe enough to dislocate the joint, such dislocation is and of itself points to the strong likelihood the joint capsule had to be ruptured, and ligaments of the joint thereby torn. The ligaments are attached to and enmeshed in the bone. Any tearing of the ligament from the bone is going to remove some of the bone. Dr. Carter said it was like tearing wallpaper from the wall. The splinters might be so small they could only be detected by microscope. The fragment might be large enough where the observer could see not only the chip, but the broken off place in the bone where it came from. Whatever Dr. Robertson saw was quite small.
Therefore, Dr. Robertson knew when he was looking at x-rays of a sprain so severe that the joint was dislocated, that in all likelihood some bone splinters were somewhere. What he saw may have been bone splinters, there may have been more he did not see. This information of a subluxation, however, would also incline him to believe what might otherwise be deemed an artifact was a bone fragment: in other words, make a false positive diagnosis.[6]
The only significance of these minute bone splinters, however, was to indicate a ligament had been pulled loose from the bone there. The damage to the bone would have been insignificant, requiring no bone repair.
Dr. Boyd already knew in all likelihood one or more ligaments had been torn loose from the bone. Any doctor who observes a sprain severe enough to have knocked bones out of joint knows he has a substantial sprain. Of what benefit would it have been to him for Dr. Clayton to have reported he saw evidence of three bone splinters? It would only have been an indication of the severity of the sprain. He already knew this. Indeed, Dr. Boyd was never asked, "Doctor, if Dr. Clayton had reported to you he saw three bone splinters, would that have made any difference in your treatment?"[7]
Thompson had a severe sprain, he had one damaged ligament, which was surgically repaired. There can be no dispute he needed adequate medical treatment and advice. A sprained joint which is not properly treated can cause serious, disabling problems. A sprained joint is weaker, less stable, and more prone to re-injury and worse damage than a healthy one.
*454 Dr. Meyer testified if he had seen Thompson in July with the history he gave, and based on the x-rays of Dr. Clayton, he would have performed some clinical tests to further evaluate the damage to his thumb, and he would have probably "splintered him and immobilized the thumb and checked him further." Another point he said he would have possibly made more x-rays at the time.[8] It is also quite significant to note Dr. Meyer, Thompson's own witness, was never asked, "Doctor, if you had received a report of three bone splinters, or `cortical evulsions' of minute size, would this in and of itself have made any difference in your treatment if you had seen Thompson in July?"
Dr. Caden, the other orthopedist, testified it would have made no difference to him in the treatment of Thompson, whether or not he had seen bone splinters on an x-ray. Had he seen Thompson initially, he would have clinically examined the thumb by routine tests of movement. He also testified he would have either put the thumb in a cast or operated on it to repair the damaged ligament.
He was asked whether such small fractures would have made a difference in his treatment, even if they had been noted. He replied: "I can't really associate it because it doesn't matter." [Vol. IV, p. 486] Then, he testified:
I don't know how more clearly I can say that an x-ray with a joint in normal alignment does not tell you whether you have a major ligament injury with or without a chip fracture. [Vol.IV, p. 487]
What would have been significant to both Dr. Meyer and Dr. Caden was the fact the thumb joint was dislocated.[9] That was an indication of the severity of the sprain. Dr. Clayton was not privy to this information in July, 1979.
Thompson's thumb was not immobilized. It was not splinted or even taped. He was sent home and told to soak it in hot water. He was also told if it did not get better to return to his doctor.
Instead, he continued his sports activities and to work with a completely unprotected hand until November, 1979, over four months later. This time his joint was back out of place again. With this scenario it would have been miraculous if he had not re-injured that thumb hundreds of times, exacerbating its condition.
It is not the purpose of this special concurring opinion to blame anybody. But I certainly have an obligation to remove blame from what I can only conclude was a competent physician who did nothing negligent. Despite the contentions of Dr. Robertson, we would have to abandon common knowledge and basic wisdom to accept plaintiff's thesis of liability. While the record indicates Dr. Robertson is a technically competent radiologist, not markedly less obvious is a hypercritical stance frequently demonstrated when citizens of the British Commonwealth (of English descent) evaluate others.
The whole thrust of Thompson's case against Clayton is his alleged failure to note three bone fragments and tell Boyd that his patient had a sprain in which some ligaments had been torn loose. Knowing his patient had suffered a lick so severe it knocked the joint out of place, if Boyd did not already know this, a 2 X 4 would not have made it any plainer.
NOTES
[1] The precise area involved was the joint at the base of the thumb, where it joined the hand. The bone in the palm of the hand which connects the thumb to the wrist is called the first metacarpal. The thumb has two bones, the first phalanax (also called first or proximal phalange), which joins (or "articulates" with) the metacarpal, and the second phalanx (also called the second or distal phalange). The medical meaning of "articulation" is a joint which permits movement.
[2] Thompson testified the doctor gave him no instructions.
[3] "Subluxation" means an incomplete or partial dislocation.
[4] Dr. Meyer also took additional x-ray views in his office, but they are not part of the record.
[5] It is not clear from the record that Dr. Packer was referring to the same streak or "density" which Dr. Clayton testified to.
[6] Just as he may have missed a splinter that was there, he may have interpreted something that was not a bone fragment as one, knowing fragments should be somewhere.

If Dr. Robertson saw anything on the films, it was at most three minute deviations. A naked eye examination of a perceived anomaly of this dimension hardly justifies certainty. Indeed, to proclaim with certainty what the spot actually was arouses suspicion, not admiration.
That Dr. Robertson's opinion was a false positive is conclusively established by the surgeon's testimony he observed no fractures.
[7] He was asked if he had known there was a fracture would this have made a difference. This is quite a different question. Even this enlightenment was elicited in the brilliant question by the cross-examiner.
[8] No fault in Dr. Clayton's report can be predicated from Dr. Meyer's saying he would possibly have made more x-rays. He made more office x-rays of Thompson following receipt of Dr. Clayton's November films and report. Additional office x-rays were routine.
[9] Indeed, it is important to note that even Dr. Robertson testified that while the x-ray films showed evidence of three bone fragments, what convinced him was the knowledge the joint had been dislocated by trauma of ligament tearing.