# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2023-CA-00862-SCT

*STRIBLING EQUIPMENT, LLC, NEW
STRIBLING EQUIPMENT, LLC, EMPIRE TRUCK
SALES, LLC, EMPIRE TRUCKS OF RICHLAND,
LLC, EMPIRE TRUCK SALES OF LOUISIANA,
LLC, AND G&S HOLDINGS, LLC*

*v.*

*EASON PROPANE, LLC*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/16/2023 |
| TRIAL JUDGE: | HON. BRAD ASHLEY TOUCHSTONE |
| TRIAL COURT ATTORNEYS: | JAMES K. DUKES |
| | SETH MAGILL HUNTER |
| | EDWARD C. TAYLOR |
| | KATIE RYAN VAN CAMP |
| | TYLER HOWARD ALEXANDER |
| | LEE BLANTON ZIFFER |
| | DEBORAH DEROCHE KUCHLER |
| | JANIKA DANYEA POLK |
| COURT FROM WHICH APPEALED: | LAMAR COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | EDWARD C. TAYLOR |
| | KATIE RYAN VAN CAMP |
| ATTORNEY FOR APPELLEE: | SETH MAGILL HUNTER |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 10/17/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE KING, P.J., MAXWELL AND GRIFFIS, JJ.**

**MAXWELL, JUSTICE, FOR THE COURT:**

¶1. Eason Propane, LLC, sued Empire Truck, LLC, after the wire harness system of

Eason Propane's practically new Freightliner propane-powered delivery truck caught fire.

Empire[1] had been working on the truck and admittedly skipped a step, causing the fire. The jury found Empire liable and awarded Eason Propane $263,443.39. After trial, Empire moved for a new trial on damages only or, alternatively, a remittitur. Empire argued the amount of the jury's damages award was against the overwhelming weight of the evidence. The trial court denied the motion, and Empire now appeals.

¶2.     Empire claims the trial court abused its discretion by denying a new damages trial and/or remittitur. But after review, it is clear the trial court properly exercised restraint by allowing the jury's damages award to stand.

¶3.     For the trial court to grant a new trial or remittitur, the award must be manifestly unjust or so excessive that it shocks the conscience. And that cannot be said here. The jury's damages award was high—representing the full amount of damages Eason Propane requested. But it was not shocking, especially in light of Empire's admittedly negligent actions and the ruinous consequences on Eason Propane's brand-new propane delivery truck.

¶4.     Eason Propane presented evidence that the truck was essentially totaled by the fire, causing losses to Eason Propane's business. That Empire takes issue with the evidence on appeal is not grounds to disturb the jury's damages award. Thus, we affirm.

### Background Facts & Procedural History

¶5.     Eason Propane sells propane to rural areas in south Mississippi. In August 2016, it purchased a brand new 2016 Freightliner S2G propane-powered propane delivery truck. Eason Propane paid $145,650.57. The price included the cost of the chassis—$76,445.50.

---

[1] Eason Propane also sued several related entities. This opinion refers to the defendants collectively as Empire.

It also included the cost of outfitting the chassis with the propane tank and propane-pumping equipment—$69,205.07.

¶6.     In December 2016, the Freightliner signaled an issue with the coolant system. So Eason Propane took the truck to Empire Truck Sales, an authorized Freightliner dealer in Hattiesburg, Mississippi.[2] At the time, the truck had only 8,412 miles.

¶7.     Empire in turn contacted the manufacturer for repair instructions. The repairs were estimated to take a few days. But Empire kept the Freightliner for several weeks. In Empire's own words, "[d]uring the repair process, a step was missed, and when the truck was cranked, a fire occurred." While Empire downplays the duration and extent of the fire, Eason Propane points to evidence that the fire damaged not only the engine but the truck's wire harness and electrical system.

¶8.     Empire did not immediately notify Eason Propane of the fire. Only after numerous phone calls asking why the truck was not ready did Eason Propane's proprietor, Ronald Eason, first learn about the fire. And it was only when Ronald dropped by Empire in January 2017 that he saw first-hand the actual extent of the damage.

¶9.     What followed was months turning into years of Empire stringing along Eason Propane by promising to make the Freightliner as good as new and continually making repairs. And in response, Eason Propane expressed exasperation with Empire for either having to continually tow the 2016 Freightliner to Empire or having to try to repair the truck itself. Finally, in May 2018, Eason Propane sued Empire. In April 2020, Empire told Eason

_____

[2] Empire did not sell Eason Propane the truck. Eason Propane had bought the truck in Texas.

Propane it would no longer work on the truck. Eason Propane amended its complaint in September 2020, raising multiple causes of action.[3]

¶10. In May 2023, a three-day trial was held in Lamar County Circuit Court. Ronald testified for Eason Propane. He explained that his company bought the brand-new, propane-powered Freightliner to expand his business's geographical service area and customer base. Before the fire, Eason Propane could deliver to customers seventy miles away. But after the fire, Eason Propane was limited to servicing a forty-mile radius. So its planned business expansion had been thwarted. And Eason Propane had to stop servicing certain areas outside the forty-mile radius. It also had to turn away requests for propane. Even its regular customers often had to turn to other propane providers because Eason Propane could not meet delivery requests.

¶11. Ronald testified that once Eason Propane was able to purchase two new trucks—and service a larger area as originally planned in 2016—each new truck created $20,000 in profit per year. So had the 2016 Freightliner been working properly, Eason Propane argued it would have generated $120,000 in profits from 2016 to the time of trial.

¶12. Ronald also testified about the numerous issues with the truck and the amount of time it was out of service.[4] The truck would constantly "die"—while at a stop sign or pumping

_____

[3] Eason Propane alleged negligence, bailment, breach of express warranty, breach of implied warranties, intentional and/or negligent misrepresentation and concealment, civil conspiracy, breach of duty of good faith and fair dealing/bad faith, intentional and/or negligent interference with business relations, intentional and/or negligent interference with contractual relations, and respondeat superior.

[4] Eason Propane also called two employees to testify about the numerous problems with the truck after the fire. One employee testified that many times he was not able to

propane—sometimes up to fifteen times a day. And it had to be towed back to Empire at least a dozen times. Eason Propane eventually bought a 1999 model propane truck with 500,000 miles on it rather than try to use the continually broken 2016 Freightliner. At the time of trial, the 2016 Freightliner had 129,000 miles on it. It had logged 90,000 miles for Eason Propane. But according to Ronald, a truck like that normally would have logged 40,000-60,000 miles a year. Similarly, the 2016 Freightliner had delivered 1.8 million gallons of propane, but Ronald testified this truck was way short. Eason Propane expected to have pumped around 5 million gallons by that time. More than a year before trial, Eason Propane stopped using the 2016 Freightliner altogether. It transferred the propane tank and propane-pumping equipment onto a new 2022 Freightliner. The transfer cost was $36,250.96.

¶13. Eason Propane also called two experts. The first, Rick Jones, testified about the fire damage to the truck. Jones testified the fire had caused heat damage to the wire harness system, but the system had never been replaced. Jones attributed the extensive recurring problems with the truck to the burned electrical system.

¶14. Eason Propane's second expert, Jason Gamble, testified about the 2016 Freightliner's value. In Gamble's expert opinion, the chassis had zero value after the fire. Specifically, Gamble testified he would never take a truck on trade that had been burned like that. But the propane equipment would have been worth $35,000 to $40,000. Gamble estimated that at the time of the trial, the truck, had it been a fully functioning propane delivery truck, would

complete a service call on time because of truck issues.

5

have been worth $100,000—including the value of the equipment. And but for the fire, the chassis without the equipment would have been worth $30,000.

¶15. Empire countered with its own valuation expert and accounting expert.[5] Specifically, the accounting expert testified he had reviewed Eason Propane's tax returns and Ronald's pretrial deposition. In his opinion, during the relevant time period (2016-2021), "there were no lost profits whatsoever" for Eason Propane.

¶16. After deliberating, the jury found Empire liable. And it awarded Eason Propane damages in the following amounts:

| | |
|---|---|
| Diminution in Value | $112,698.46 |
| Cost of Repairs | $24,744.93 |
| Loss of Profits | $120,000.00 |
| Other Consequential Damages | $6,000.00 |

Empire moved for a new trial or, alternatively, a remittitur in the amount of damages awarded. Empire asserted the overwhelming weight of the evidence did not support the jury's award for diminution in value and lost profits. The trial court denied this motion. And Empire timely appealed.

**Discussion**

¶17. On appeal, Empire does not contest liability. Its sole focus is on damages. Empire argues the trial court erred by denying its motion for a new trial or, alternatively, for a remittitur. It claims the jury's $112,689.46 award for diminution in value of the truck and $120,000 award for lost profits are both against the overwhelming weight of the evidence. And it asks this Court to either reverse and remand for a new trial on damages or grant a

[5] Empire also called two employees to testify.

6

remittitur.  But Empire faces a steep hill in its quest to reduce or retry the jury's damages award.  This is because this Court has very limited authority to grant the relief Empire seeks.

¶18.    First, this Court's "authority to reverse [the denial of a motion for new trial] is limited to those cases wherein the trial judge has abused his discretion."  *Anchor Coatings, Inc. v. Marine Indus. Residential Insulation, Inc.*, 490 So. 2d 1210, 1215 (Miss. 1986) (citing *Clayton v. Thompson*, 475 So. 2d 439, 443 (Miss. 1985); *Jesco, Inc. v. Whitehead*, 451 So. 2d 706 (Miss. 1984)).  And a trial judge may only grant a motion for new trial if, viewing the entire record in the light most favorable to the nonmovant, "the trial judge is left with a firm and definite conviction that the verdict, if allowed to stand, would work a miscarriage of justice."  *Id.*

¶19.    Second, though this Court may affirm a damages award on condition of a remittitur,[6] such authority may only be exercised when the damages award "is so excessive that it evinces passion, bias and prejudice on the part of the jury so as to shock the conscience."  *Royal Oil Co. v. Wells*, 500 So. 2d 439, 449 (Miss. 1986) (citing *Bankers Life & Cas. Co. v. Crenshaw*, 483 So. 2d 254, 278 (Miss. 1985); *Jesco, Inc. v. Shannon*, 451 So. 2d 694, 705 (Miss. 1984); *City of Jackson v. Locklar*, 431 So.2d 475, 481 (Miss. 1983)).  This high bar

---

[6] Mississippi Code Section 11-1-55 (Rev. 2019) confers on this Court "or any other court of record in a case in which money damages were awarded" the discretionary authority to "overrule a motion for new trial or affirm on direct or cross appeal, upon condition of an additur or remittitur[.]"  Such discretion may only be utilized "if the court finds that the damages are excessive or inadequate for the reason that the jury or trier of the facts was influenced by bias, prejudice, or passion, or that the damages awarded were contrary to the overwhelming weight of credible evidence."  *Id.*  Further, "[i]f such additur or remittitur be not accepted [by the nonmoving party] then the court may direct a new trial on damages only."  *Id.*

exists because remittiturs "represent a judicial incursion into the traditional habitat of the jury[.]" *Gibbs v. Banks*, 527 So. 2d 658, 659 (Miss. 1988). That is why this Court should not employ its limited authority to grant a remittitur "without great caution." *Id.*

¶20. Exercising this great caution, we deny Empire's requested relief. While the conflicting evidence could have supported a smaller damages award, the jury's decision to grant Eason Propane the full amount of damages sought neither shocks the conscience nor is so contrary to the overwhelming weight of the evidence that to let it stand would be manifestly unjust.

### I. Diminution in Value

¶21. Empire first argues the jury's awarding Eason $112,689.46 for the truck's diminution in value was against the overwhelming weight of the evidence.

¶22. The diminution-in-value question came down to whether the fire caused a total loss of the chassis or if some value remained. This was a jury question. "The general rule is that if there is any remaining value to the damaged property . . . then the measure of damages is the difference in the value immediately before the casualty or loss and the value immediately after the damage or injury to the property." *Harper v. Hudson*, 418 So. 2d 54, 57 (Miss. 1982) (citing *Stigall v. Sharkey Cnty.*, 213 Miss. 798, 58 So. 2d 5 (1952)). "Of course, if the property is totally destroyed and rendered absolutely valueless in the accident or casualty, the damages would be the value of the property at the time of such destruction." *Id.* (citing *Fed. Compress & Warehouse Co. v. Reed*, 339 So. 2d 547 (Miss. 1976)).

¶23. Empire insists the chassis still had value after the fire. It points to Eason Propane's

8

driving it another 120,000 miles and using it to pump 1.8 million gallons of propane. Based on Gamble's expert testimony that the chassis would have been worth $30,000 in 2021 but for the fire, Empire argues Eason Propane was entitled to $30,000 at most for diminution in value because the propane equipment was still usable.[7]

¶24. Eason Propane, through its expert, presented evidence that the chassis had no value after the fire. That is because the fire destroyed the entire electrical and wire harness system. And while there was evidence that Eason Propane tried to use the truck after the fire, its use was fraught with constant problems and headaches.

¶25. The jury agreed with Eason Propane and its expert that the chassis had no value after the fire. The jury's diminution-in-value award represents what Eason Property had paid for the chassis months before it was burned in the fire—$76,438.50—plus its cost to transfer the propane equipment to a new truck—$36,250.96. This Court is "not authorized to disturb a jury verdict regarding amount of damages because it 'seems too high' or 'seems too low.'" *Royal Oil Co.*, 500 So. 2d at 449 (citing *Crenshaw*, 483 So. 2d at 278; *Toyota Motor Co., Ltd. v. Sanford*, 375 So. 2d 1036, 1037 (Miss. 1979)). That the jury sided with Eason Propane's expert's testimony that the chassis had zero trade-in value immediately after the fire was not against the overwhelming weight of the evidence. Nor did it demonstrate bias or passion on the jury's part.

¶26. Thus, the trial court did not abuse its discretion by denying Empire a new trial or a remittitur. This Court affirms the $112,689.46 diminution-in-value award.

---

[7] Empire ignores the $35,000-$40,000 cost of transferring the propane equipment.

## II.    Lost Profits

¶27.    Next, Empire challenges the $120,000 lost-profits award.  It similarly argues the award also was against the overwhelming weight of the evidence.

¶28.    Empire claims the evidence did not establish to a reasonable certainty that Eason Propane suffered *any* loss—let alone a $120,000 one.  Empire contends that Ronald's lay testimony[8] that his company missed out on customers and sales was purely speculative.  And Empire points to its own expert's testimony that, based on Eason Propane's tax returns, there were no lost profits.

¶29.    Empire's argument relies on ***Healy v. AT&T Services, Inc.***, 362 So. 3d 14 (Miss. 2023).  ***Healy*** was a breach-of-contract case in which a phone carrier accidentally reassigned a law firm's 1-800 number to another business without the law firm's knowledge.  ***Id.*** at 16.  Following a bench trial, the chancellor ruled that AT&T had breached the service contract.  But the judge awarded only nominal damages.  ***Id.***  Specifically, the chancellor rejected the law firm's claim for lost profits.  ***Id.*** at 19.  While the law firm insisted the misdirected toll-free number caused it to lose potential clients and profits, the firm's advertising listed multiple ways to contact it—not just the 1-800 number.  ***Id.***  Because of this, the chancellor reasoned the evidence did not show any decreased earnings due to the botched 1-800 number.  ***Id.***  On appeal, this Court affirmed.  We emphasized that in a breach-of-contract case, lost profits must be proved to a reasonable certainty.  ***Id.***  And to do so requires a clear

---

[8] Before trial, Empire moved to exclude Ronald as an expert.  The trial court granted the motion.  But the judge did not preclude Ronald from testifying as a lay witness about his business's losses.

methodology with supporting documentation to explain how the breach caused the lost profits. *Id.* at 21.

¶30. Citing *Healy*, Empire argues that, while Ronald testified Empire started earning $20,000 a year more once it finally got a new working propane-delivery truck, Ronald did not identify any clear methodology for arriving at that figure. Nor did he provide any supporting documentation, like tax returns. As in *Healy*, Empire asserts the evidence "simply does not exist to show any decrease in earnings was due to the [fire]." *Id.* at 17.

¶31. But Empire's reliance on *Healy* is misplaced.

¶32. First, this is not a pure breach-of-contract case. In fact, the jury was not even instructed on breach of contract. Rather the jury was instructed on other theories such as negligence, bailment, and breach of warranty. Second, *Healy* arrived at this Court in a different procedural posture. There, the chancellor rejected the lost-profits claim. So the question was did the chancellor abuse his discretion when he found the evidence did not support a lost-profits award? *Id.* Here, the jury awarded lost profits. And it did so after being properly instructed that it must find "the loss of profits is the direct and natural consequence of [Empire's] conduct," "[t]he amount of lost profits can be shown with reasonable certainty," and "[t]he amount of lost profits cannot be based on conjecture and speculation." So the question before us is whether the lost-profits damages award "is so excessive that it evinces passion, bias and prejudice on the part of the jury so as to shock the conscience." *Royal Oil Co.*, 500 So. 2d at 449.

¶33. Further, in *Healy*, because the law firm advertised multiple ways to contact it, it could

11

not show *how* the misdirected 1-800 number caused a loss of potential clients. *Id.* at 19. Here, by contrast, Ronald testified that the burned-out truck caused Eason Propane to turn away all potential customers outside a forty-mile radius. While Eason Propane had other trucks—unlike the 2016 Freightliner—none were equipped to travel to the expanded service area. Ronald also testified that the burned truck's recurring issues caused delays in completing service calls within the forty-mile service area. These delays often caused existing customers to seek out other companies to obtain propane.

¶34. Finally, contrary to Empire's assertion, Eason Propane's tax returns support Ronald's estimation that a fully functioning new propane-powered truck would have increased net profits $20,000 a year. The tax returns show a decline in profits from 2016-2017 after the fire. Profits then flatlined from 2017-2019. And from 2019-2021, when Eason Propane began adding new trucks, profits increased $20,000 a year.

¶35. Instead of *Healy*, this case is more akin to ***Schoppe v. Applied Chemicals Division, Mobley Company, Inc.***, 418 So. 2d 833 (1982). Like this case, *Schoppe* was a negligence case. *Id.* at 834. There, negligently applied defoliant along a railroad track caused a neighboring farm to lose crops. *Id.* And like this case, the owner of the farm and two farm employees testified about lost profits. *Id.* at 835. Specifically, the owner walked through the fields and counted bolls and pods and estimated a percentage or yield decrease due to the chemicals. *Id.* The jury found the lost-profits damages were lower than the owner's estimation. *Id.* at 835. And following the jury's verdict, the trial court granted a remittitur, cutting the award even more. *Id.*

12

¶36. On appeal, this Court reversed the trial court's remittitur and reinstated the jury's award. *Id.* at 837. The chemical company made a similar challenge to Empire's—that the owner's methodology was not accurate and that the farm's records did not support its claimed losses. *Id.* The chemical company also claimed its experts' testimony was more credible because it suggested its experts were more qualified than the owner, who lacked formal education in agriculture. *Id.* This Court rejected those arguments. We emphasized it was the jury's job to weigh the credibility of competing testimony and competing interpretations of the farm's documents. *Id.* While the owner's "computation of damages may not have been the most accurate method, his approximation remained in evidence." *Id.* And "[t]he amount of damages awarded by the jury was certainly within the range of evidence presented by both sides." *Id.*

¶37. The same is true here. Based on Ronald's explanation of the tax returns and his $20,000-loss-per-year claim, the trial judge rejected Empire's motion for directed verdict. And he allowed the lost-profits claim to go to the jury. As the trial judge explained, "There was a basis provided. Now, whether or not it was a good one or a strong one, I think is for the jury to decide." And the jury did decide, finding Ronald's lost-profits testimony credible and Empire's expert's testimony not credible. Like this Court said in *Schoppe*, "it was not for the trial judge to choose in effect to disregard [Eason Propane's] evidence and remit the jury's award of damages . . . ." *Id.* at 837.

¶38. The only difference between *Schoppe* and this case is that the jury here decided to award the entire amount of lost profits claimed—$20,000 a year for six years. Still the jury's

13

awarding the full amount of lost profits claimed does not shock the conscience.  Therefore, we affirm the lost-profits award and the diminution-of-value award.

¶39.  **AFFIRMED.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN, BEAM, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR.**