568 So.2d 269 (1990)
Walter L. HARRIS, Sr., Administrator of Estate of Judith Alice Harris, Deceased
v.
Frances Richter SHIELDS, Executrix of the Estate of Charles Morris Shields, Deceased.
No. 07-CA-58962.
Supreme Court of Mississippi.
August 15, 1990.
Rehearing Denied October 17, 1990.
Hick H.H. McClanahan, III, David S. Van Every, Columbus, for appellant.
Andrew N. Alexander, III, Lake Tindall Hunger & Thackston, Greenville, for appellee.
*270 Before HAWKINS, P.J., and ROBERTSON and SULLIVAN, JJ.
ROBERTSON, Justice, for the Court:

I.
In May of 1985, Judith Alice Harris faced the painful prospect of having her teeth removed  all of them. She entered the dental office of Dr. Charles Morris Shields for her second extraction session, received the usual anesthetic, experienced a few fitful minutes, then lapsed into unconsciousness to the stunned surprise of everyone. She died seven days later.
In time, Harris' husband brought this wrongful death action, charging that Dr. Shields[1] had been guilty of dental malpractice, in that Dr. Shields failed to check her blood pressure before proceeding. Harris suffered a directed verdict at trial. He appeals and the question is whether the expert he tendered provided a credible opinion from which a jury may have found a failure of Dr. Shields the legal cause of his wife's death.

II.
Judith Alice Harris was a 40-year-old homemaker who lived in Greenwood, Mississippi, standing approximately 5' 1" tall. She consistently weighed over 200 pounds. Judith was married to Walter L. Harris, Sr.
Beginning in June of 1982, Judith became a patient of Dr. W. Merrill Hicks, a Greenwood physician specializing in internal medicine. Over the next three years, Judith intermittently came to see Dr. Hicks at his office for an assortment of medical and emotional problems.
On February 26, 1985, Judith Harris went to the dental office of Dr. Charles Morris Shields in Greenwood and was seen by Dr. Deborah Gregory, Dr. Shields' associate, who diagnosed an acute infection, with paresthesia and generalized periodontal disease. Judith was experiencing considerable pain at the time. Dr. Gregory obtained a medical and dental history and then had Judith seen by Dr. Shields who, after examination, recommended removal of all of her teeth. Judith acquiesced.
Because of information gleaned from the medical history, Dr. Shields consulted with Dr. Hicks concerning the proposed procedure. Dr. Hicks' medical records reflected a notation on June 7, 1982, that "she had one bad seizure seven years ago." On rare occasions, a seizure may be a symptom of congenital vascular malformation. As of June 7, 1982, Dr. Hicks placed Judith on Dilantin 100 mg. and on July 13, 1982, this was increased to 300 mg. "because she had a spell something like a seizure."
According to Dr. Hicks' medical records, Judith's blood pressure readings were:

06/07/82 130/90
07/13/82 130/80
09/17/82 150/95
03/28/83 140/90
05/26/83 130/80
07/30/84 140/100 During this visit Dr.
 Hicks told Harris "If your BP
 stays up for 4 weeks then I'll
 prescribe the medication for
 that." [Medical Records]
02/13/85 140/98 Weight = 223 lbs.
 "Inderal, 20 mg TID to help
 both the tachycardia, anxiety,
 and hypertension."
03/15/85 130/90 Weight = 225 lbs.
 "She presented here for a medical
 evaluation for dental abscess
 which she does have.
 Plan: 1. Recommend removal
 of all teeth... ."
04/15/85 130/88 Weight = 225

Dr. Hicks sent a note to Dr. Shields giving the go ahead with the extractions and listing the medication.
"To Whom It May Concern:
I believe that Judith Harris should have total dental extraction because of recent abscessed teeth. Her medicines are: Xanax 1 mg TID; Tagamet 300 mg QID; Lomotil 2.5 mg po TID ...; Inderal 20 mg po BID."
Dr. Shields noted on his health history that Judith had a history of high blood pressure.
*271 In response to Judith's request, Dr. Shields telephoned Dr. Hicks and asked if it would be advisable that he perform the extractions in a hospital. Dr. Hicks replied that he saw no medical reason for this course. On May 6, 1985, Dr. Shields pulled two of Judith's teeth without incident.
On May 20, 1985, Judith returned to Dr. Shields' office for a second series of extractions. Darla Lubas, Dr. Shields' dental assistant, describes what happened:
A. Mrs. Harris was our first patient and Anna Henderson took Mrs. Harris back to the back room, the operatory, and seated her and she went up there to get Dr. Shields and myself, and we went back there and he laid her back to give her some anesthesia. He was extracting some of her front teeth. Everything was normal. She was a little bid [sic] edgy, which is not unusual for a dental patient. And he gave her the anesthesia, everything was fine. I was standing there observing him give the anesthesia. And then a few minutes later she looked at us and said that her head was pounding, that she felt a little nauseated, so Charles ... Dr. Shields let her up and put some paper towels and put them on her forehead and she was fine; and he was standing there and I was standing there and she said her head was pounding, and then she began to regurgitate and I held the trash can for her while she got sick, and Charles left the room to call Dr. Hicks. * * * So she was back there, she got sick again; and after the second time, she felt fine, she was okay. We had her sitting up and I was back there with her talking to her. And she was fine, she was coherent. I had taken her pulse; her pulse was not erratic. Her pupils were normal. We were talking and she looked at me and she said, "I'm just scared. I think I'm having a cerebral hemorrhage." And I said, "A cerebral hemorrhage." I said, "No ma'am," and she said, "Yeah." And I said, "No, ma'am you don't have to worry, you're not having one of those." And then we started talking and a few seconds later she became incoherent. She started to babble. She started talking about the little girl next door, started talking about her husband would be mad at her, starting [sic] taking Valium, and the next thing I knew she was out. Her eyes went in the back of her head and she was out.
She was taken to Greenwood-Leflore Hospital and died seven days later, never having regained consciousness.
Dr. Donald E. Pierce, staff pathologist at the Greenwood-Leflore Hospital, performed an autopsy and identified as the cause of Judith Harris' death "Massive cerebral hemorrhage from vascular malformation at base of brain with extensive encephalomalcia." Put more simply, Dr. Pierce said what killed Judith was intracranial pressure produced by her cerebral hemorrhage. Judith had "[a] vascular malformation [which is] a cluster of thin walled abnormal vessels. They would have ... thin walls and would be weaker than normal vessels." "A rupture would be when the wall of the vessel just breaks open and the blood is released into the area outside the vessels." Judith's vascular malformation was a congenital weakness.
No one suggests Dr. Shields or any member of his staff did anything which directly caused Judith's death. More specifically, Judith's husband and administrator, Plaintiff below and Appellant here, concedes his wife's death was in no way a reaction to the anesthetic. Dr. Pierce testified
[Judith Harris] had the vascular malformation. It was a weakness that was there; and, in my opinion, it was... it was just a matter of coincidence and timing that it happened at the time and place that it did. There was a weakness there and it finally gave way.
Dr. Hicks, Dr. Gregory and the several employees and attendants in Dr. Shields' office each testified and in such a way as to exonerate Dr. Shields. The Circuit Court accepted this testimony and directed a verdict for Dr. Shields, dismissing Judith's administrator's suit, and the question is whether he countered this testimony with evidence sufficiently credible that a reasonable jury could have found in his favor on *272 each element of his claim. Enter Dr. Gerughty.

III.

A.
The critical issue is one of legal cause. Plaintiff administrator at trial and here seeks to survive via the testimony of Dr. Ronald P. Gerughty. Dr. Gerughty possesses impressive credentials. He is Dean of the College of Health at the University of Central Florida in Orlando. He holds a D.D.S. in dental surgery and a Ph.D. in pathology, both from the University of California. Dr. Gerughty has completed a medical residency in anatomic and surgical pathology and has obtained board certification in oral pathology and in recent years has practiced in the sub-specialty field of forensic pathology.
Below and here the parties spend much time arguing Dr. Gerughty's qualifications and in a form we find familiar, they focus upon the effect of Dr. Gerughty's lack of a medical degree. As important as that formal degree may be  and certainly is  we regard it settled that persons otherwise qualified within Rule 702, Miss.R.Ev.,[2] may express opinions in areas once thought the exclusive domain of the medical profession, notwithstanding the witness' lack of an M.D. degree. See, e.g., Thompson v. Carter, 518 So.2d 609, 614-15 (Miss. 1987); Sonford Products Corporation v. Freels, 495 So.2d 468, 472-73 (Miss. 1986); Mississippi Farm Bureau Mutual Insurance Company v. Garrett, 487 So.2d 1320, 1326-27 (Miss. 1986). Conversely, not every M.D. is a qualified expert in every medical malpractice case. See Hall v. Hilbun, 466 So.2d 856, 875 (Miss. 1985); but see Brown v. Mladineo, 504 So.2d 1201, 1202-03 (Miss. 1987). The question is whether the particular witness really is an expert in the field in which he or she is tendered. Formal education is but one route to expertise. En route to considering whether the Court may have erred, we must visit our rules of predicate providing that as a preliminary step, the plaintiff must prove that the error, if there be one, makes a difference. Rule 103(a)(2),[3] Miss.R.Ev., carries forward our pre-rules law, which required of plaintiff a proffer of an opinion through Dr. Gerughty of such quality that it would, if accepted, and considered together with plaintiff's other proof, establish the vital causal link. The point is of importance for, even if we consider that the Court below erred and that it should have allowed Dr. Gerughty to express his opinion on causation, we may not reverse unless we find that this opinion augments plaintiff's proof such that plaintiff should probably survive a defense motion for a directed verdict.[4]See Hammond v. Grissom, 470 So.2d 1049, 1053 (Miss. 1985); Murray v. Payne, 437 So.2d 47, 55 (Miss. 1983). Otherwise, exclusion of Dr. Gerughty's testimony may not be said to have "affected ... a substantial right" of plaintiff. Rule 103(a), Miss.R.Ev. All of this requires that we engage and apply two types of rules, one commonly considered as of substance and the other informing our attitude toward the evidence given a party's right to have factual disputes resolved by a jury. Miss. Const. Art. 3 § 31 (1890).

B.
We begin with our general premises. Each phyician, by virtue of the positive, *273 substantive law of this state, has to each patient a non-delegable duty of care consistent with the level of expertise the physician holds himself out as possessing and with the circumstances of the case. See, e.g., Walker By and Through Walker v. Skiwski, 529 So.2d 184, 185 (Miss. 1988); Ladner v. Campbell, 515 So.2d 882, 888 (Miss. 1987); Hall v. Hilbun, 466 So.2d 856, 866, 869-72 (Miss. 1985). Our law imposes these duties upon dentists as well as doctors, Palmer v. Biloxi Regional Medical Center, 564 So.2d 1346 (Miss. 1990); Pittman v. Hodges, 462 So.2d 330, 333-36 (Miss. 1984); Newport v. Hyde, 244 Miss. 870, 147 So.2d 113, 115 (Miss. 1962), and upon other professionals as well. E.g., Stewart v. Walls, 534 So.2d 1033, 1035 (Miss. 1988); Hickox By and Through Hickox v. Holleman, 502 So.2d 626, 634-36 (Miss. 1987).
A competent dentist is not liable per se for a mere error of judgment, mistaken diagnosis or the occurrence of an undesirable result. Put otherwise, a dentist is not an insurer of the success of his care and treatment. See, e.g., Hudson v. Taleff, 546 So.2d 359, 364 (Miss. 1989); Hall v. Hilbun, 466 So.2d at 866; Dazet v. Bass, 254 So.2d 183, 187 (Miss. 1971). The plaintiff patient must establish the standard of care to which the dentist is held and then show that the dentist's deviance therefrom caused plaintiff's damages. See, e.g., Thompson v. Carter, 518 So.2d 609, 611 (Miss. 1987); Marshall v. The Clinic For Women, P.A., 490 So.2d 861, 865 (Miss. 1986).

C.
The deficiency in care Walter Harris charges to Dr. Shields is failure to take his wife's blood pressure before proceeding on the afternoon of May 20, 1985. Plaintiff proffered through Dr. Gerughty  and the Circuit Court accepted[5]  that proper care required that Dr. Shields check his patient's vital signs  particularly including blood pressure, in view of the medical history. Without question, Dr. Shields did not do this, for he did not possess a blood pressure cuff within his office. Plaintiff's theory is that a blood pressure check would have alerted Dr. Shields that Harris was in danger and that he could then have terminated his procedure and that his failure to do this stripped her of any chance of survival. The precise question then becomes whether Dr. Gerughty offered a credible opinion which  coupled with plaintiff's other proof  established that Dr. Shields' failure to obtain Judith Harris' blood pressure was a legal cause of her cerebral hemorrhage and ultimately her death.
We cannot know with certainty the results of what was not done if it had been done. A measure of speculation is inherent in any causation inquiry in a malpractice case. On the other hand, we have insisted that proof of causation remain within the realm of the reasonably probable and condemn the merely speculatively possible. Burnham v. Tabb, 508 So.2d 1072, 1074 (Miss. 1987); Pittman v. Hodges, 462 So.2d at 334-35.
The Court addressed a variant of today's question in Clayton v. Thompson, 475 So.2d 439 (Miss. 1985) where we said:
[h]aving in mind this reality, [that the plaintiff is rarely able to prove to an absolute certainty what would have happened if early treatment had been given] our approach to the requirement of causation in medical malpractice cases necessarily differs from that employed in most other tort contexts.
Clayton, 475 So.2d at 445. This Court held that language in jury instructions such as "a good chance" of "greater recovery"
invited impermissible speculation and conjecture by the jury. The jury's deliberation should have been channeled to consider a substantial probability, rather than a "good chance," to recover substantially greater flexibility of his thumb.
Clayton, 475 So.2d at 445.
This Court concludes, therefore, that Mississippi law does not permit recovery *274 of damages because of mere diminishment of the "chance of recovery." Recovery is allowed only when the failure of the physician to render the required level of care results in the loss of a reasonable probability of substantial improvement of the plaintiff's condition.
Clayton So.2d at 445.
We have elaborated upon the point in Ladner v. Campbell, 515 So.2d 882, 888 (Miss. 1987). The plaintiff "has to supply evidence that proper treatment would have provided the patient "with a greater than fifty (50) percent chance of a [substantially] better result than was in fact obtained." Ladner, 515 So.2d at 889. "Adequate proof of proximate cause in a medical malpractice action of this type requires evidence that in the absence of the alleged malpractice, a [significantly] better result was probable or more likely than not." Id. (citing 54 A.L.R. 4th 10 § 4).
These standards before us, we turn to several cases procedurally and substantively not unlike today's.
In Hall v. Hilbun the surgeon failed to prescribe an appropriate regimen for post-operative care. During her first night post-surgery, the patient awakened and complained repeatedly of pain and difficulty in breathing, but the nurses did nothing until it was too late. We found that plaintiff had proffered evidence adequate that a jury might find that the defendant's deficiencies proximately contributed to his patient's death and held that plaintiffs were entitled to survive a defense motion for a directed verdict. Hall, 466 So.2d at 879. There was little doubt that, if Dr. Hilbun had ordered more attentive care during the night, that would almost certainly have saved the patient's life, as explained more fully in the Court's opinion.
In Hardy v. Brantley, 471 So.2d 358 (Miss. 1985) the defendant physician failed to diagnose a perforated duodenal ulcer. We again held the evidence sufficient to show that, had the proper diagnosis been made, the patient's condition was "easily treatable." 471 So.2d at 368. Hence, plaintiff was entitled to survive defendant's motion for a directed verdict on the issue of causation. In Hammond v. Grissom, 470 So.2d 1049 (Miss. 1985), plaintiff's decedent was brought into the hospital at approximately 2:20 p.m. and then placed in a bed where she was purely and simply allowed to bleed to death without further attention  or so the plaintiff's evidence showed. More to the point, plaintiff's evidence showed that with the proper care and treatment, his wife had a substantial chance of survival and, hence, was entitled to survive a motion for directed verdict on causation. Ladner v. Campbell is to like effect, holding that the
improperly excluded testimony of Dr. Brower would have been sufficient for a jury to find the existence of proximate cause.
Ladner, 515 So.2d at 889.
By way of contrast, we note our decision in Boyd v. Lynch, 493 So.2d 1315 (Miss. 1986). Plaintiff brought her two-year-old son into the Sharkey-Issaquena Community Hospital for emergency treatment during hours when Dr. R.H.F. Lynch was on call. The attending nurse examined the child and called Dr. Lynch, describing a feverish condition, that the child could not sleep, would not take water, had swollen glands, and a "raspy" respiration. Dr. Lynch ordered additional tests but did not come to the hospital until approximately 5:00 a.m., at which time the child was pronounced dead. The cause of the child's death was epiglottitis, a form of respiratory ailment. At trial the evidence for the plaintiff established that Dr. Lynch should have obtained a pulse rate, a respiratory rate and a better description of the child's condition. The Circuit Court directed a verdict for the defendant and plaintiff appealed. This Court examined the record and found that plaintiff had failed to provide any evidence that Dr. Lynch's admitted failures caused or contributed to the child's death. Boyd, 493 So.2d at 1318. Hence, we affirmed.

D.
These cases generate principles that provide our parameters. We examine plaintiff's proffer of Dr. Gerughty and, *275 more particularly, whether plaintiff's credible evidence in the aggregate and so augmented, if believed, showed that, had Dr. Shields taken Judith Harris' blood pressure, she probably would not have lost her life. This brings us to our second rule  that regarding our attitude toward the evidence and our standard of review. When considering whether the Circuit Court correctly directed a verdict, we must look to all of the evidence (that should have been) before the Court below at the time it considered movant's motion but in the light most favorable to the non-moving party. We must give the non-moving party the benefit of all favorable inferences that may reasonably be drawn from the evidence. If the evidence, so viewed, is such that reasonable and fair-minded jurors might differ on the material facts, the law commands that the Court deny the motion. See Hall v. Hilbun, 466 So.2d at 883; Ladner v. Campbell, 515 So.2d at 887; Burnham v. Tabb, 508 So.2d at 1075; Latham v. Hayes, 495 So.2d 453, 457 (Miss. 1986); Marshall v. The Clinic for Women, P.A., 490 So.2d at 865; Pittman v. Hodges, 462 So.2d at 334.
But what would a pre-anesthetic blood pressure check on the afternoon of May 20 have shown? We know that paramedic Todd Perry, called to the scene after Judith's collapse, found her "to have an alarming blood pressure of 220/120." Her initial blood pressure reading at the hospital minutes later was 190/110. But we also know that post-event blood pressure readings mean next to nothing. When asked what relevance post-hemorrhage blood pressure readings "have to tell anybody anything about what that blood pressure was before the arrest?", Dr. Gerughty answered "Probably none."
Dr. Gerughty accepted that no one could say with certainty what a blood pressure reading on the afternoon of May 20 would have shown, but "what you can do is you can extrapolate by blood pressure to find out what is more likely than not." Referring to Dr. Hicks' charts, Dr. Gerughty began with Harris' lowest recorded blood pressure  130/88[6]  and speculated that
A normal individual that is about to undergo dental surgery will have an increase in blood pressure anywhere from five to fifteen millimeters, that an apprehensive person would have an increase in blood pressure of twenty to thirty or more millimeters in mercury.
Applying this extrapolation process to Judith Harris, whom the record reflects a nervous, apprehensive and anxious person who had been treated with anti-depressants and anti-anxiety tranquilizers, Dr. Gerughty said we should
do the simple extrapolation of basing that on her controlled level 130 over, roughly, 90, you have got a minimal blood pressure of 150 or 160/110 or 120, which is dangerously elevated and contraindicates any dental procedure.
Surviving this hurdle, which involves no mean leap of faith, plaintiff faces the unequivocal testimony of Dr. Pierce that even if Dr. Shields had taken Judith's blood pressure  and stopped, Judith's vascular rupture would have happened anyway. Dr. Pierce said the rupture was something "coincidental" with her appearance in Dr. Shields' office. Dr. Hicks offered an opinion to the same effect. Dr. Gerughty was presented with Dr. Pierce's opinion and responded with the conclusory "I would disagree with that ... very strongly."
But Dr. Shields' directed verdict does not hang upon any acceptance of Dr. Pierce's coincidence theory, but rather on whether plaintiff presented a credible case that Dr. Shields' failure to check Judith's blood pressure was a substantial contributing cause of her death. The question asserts itself, assuming Dr. Shields had taken Judith's blood pressure and assuming he had obtained a reading of 150-160/100-110 and, assuming further, he had pretermitted any further procedure that day, what are the probabilities Judith Harris would have survived? Has plaintiff, through Dr. Gerughty or otherwise, see West v. State, 553 So.2d 8, 21 (Miss. 1989), offered any credible basis for disbelieving Dr. Pierce's theory and opinion based on his autopsy examination *276 that the cerebral hemorrhage was going to happen anyway?
It is important to note that some two weeks earlier, Judith had undergone a similar procedure. As she entered the office on May 20, she was no doubt familiar with the thorough unpleasantness of the extraction process. Accepting Dr. Gerughty's extrapolation process, it seems almost certain that any elevation in blood pressure would have already occurred. All Dr. Shields did was administer the anesthetic, and, though no one enjoys the moment or two before the needle pricks its point, we have no basis for thinking that Judith's blood pressure significantly elevated during those few seconds of anticipation. In point of fact, blood pressure drops substantially with anesthesia. Dr. Gerughty offers nothing affording a basis for differentiating pre-anesthetic hypertension from that post-anesthetic.
There is a further problem. Without contradiction, the evidence reflects the cause of Judith Harris' death was a massive cerebral hemorrhage flowing from a pre-existing "congenital vascular malformation." By way of contrast, Dr. Gerughty's opinion rests upon his view that Judith suffered from "hypertensive vascular disease." To be sure, this sounds a little like vascular malformation but we have searched the record in vain for any testimony that this is so. Without the aid of substantial medical expert offerings, we are not about to speculate that congenital vascular malformation and hypertensive vascular disease are even remotely similar conditions. More to the point, plaintiff bore the burden of showing the identity of these two conditions and in this he failed utterly.
Then there is a problem of the location of Judith's hemorrhage. Dr. Pierce  the pathologist and the only person who examined Judith's body  found that the hemorrhage occurred at the base of her brain. He particularly identified the malformation as a cluster of thin-walled abnormal blood vessels at the base of Judith's brain and testified further that hemorrhages caused by hypertension normally do not occur in this area. Conversely, the only evidence before us about hypertensive hemorrhages is that they normally occur in the area of the basal ganglion, a medically significantly separate area from the base of the brain. This presents yet another gap in plaintiff's causal connection evidence.
We emphasize here that we proceed on the assumption that Dr. Gerughty was competent to give an opinion regarding causation (although we have no occasion to expressly so hold). Further, we accept the preliminary admissibility of the opinion he gave  such as it was  disagreeing strongly with Dr. Pierce's coincidence theory, and that any lack of foundation or explanation goes to weight and not admissibility. See Rule 104(b), Miss.R.Ev.; West v. State, 553 So.2d at 21. The question is whether Dr. Gerughty's opinion, coupled with all of the other evidence in the case, viewed as we must in our present procedural posture, is such that reasonable and competent jurors could have found a substantial probability that Judith probably would not have lost her life had Dr. Shields known of her blood pressure on the afternoon of May 20 and not administered the anesthetic. We view this question in light of the uncontradicted evidence regarding cause of death and the presence of a vascular malformation in Judith's brain and then zero in on the precise question whether anything in the proof gives us a clue regarding the probabilities that the rupture may have been avoided had Dr. Shields known of Judith's blood pressure and withheld the anesthetic.
We have searched the record, and in vain. We find nothing offered by Dr. Gerughty  or anyone else  of the chances of sparing Judith's life, had Dr. Shields behaved as Dr. Gerughty thinks he should have. No proof before us affords a basis for seeing those chances in the 90 percent range, or 98 percent, for that matter, or as low as ten percent or even two percent. At this critical juncture we must guess and nothing in the record affords a predicate for even a half-way educated guess. Seen in this view, plaintiff's proof  and his proffer through Dr. Gerughty  legally fail. See Hammond v. Grissom, 470 So.2d 1049, 1053 (Miss. 1985); Murray v. Payne, 437 *277 So.2d 47, 55 (Miss. 1983). The Circuit Court committed no error when it directed a verdict in favor of Dr. Shields and dismissed plaintiff's complaint with prejudice.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, SULLIVAN, ANDERSON, PITTMAN and BLASS, JJ., concur.
NOTES
[1] Dr. Shields died unexpectedly in the late Summer of 1985. This action has been brought against Frances Richter Shields, his widow and executrix of his last will and testament.
[2] 702. TESTIMONY BY EXPERTS
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
[3] 103. RULINGS ON EVIDENCE
(a) Effect of Erroneous Ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and
(2) Offer of Proof. In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.
[4] All of this is but a variant on that familiar rule of appellate practice that we may not reverse if there be any basis adequate that the judgment be affirmed, though the trial court may have erred on the grounds in fact employed. See, e.g., Hickox By And Through Hickox v. Holleman, 502 So.2d 626, 635 (Miss. 1987).
[5] We have no occasion to consider whether due care demands of dentists generally that they check each patient's vital signs before performing dental surgery. We are aware that this is not customarily done in dental offices around this state.
[6] This was Judith's blood pressure reading five weeks before her death.