## IN THE SUPREME COURT OF MISSISSIPPI
### NO. 94-CA-00578-SCT

*MARY LOU BROWN*

*v.*

*DENNIS ADAMS, M.D., THE ESTATE OF LLOYD G.*
*BERRONG, M.D. AND SIMPSON GENERAL*
*HOSPITAL*

**THIS OPINION IS NOT DESIGNATED FOR PUBLICATION AND MAY NOT BE CITED,
PURSUANT TO M.R.A.P. 35-A**

| | |
|---|---|
| DATE OF JUDGMENT: | 3/30/94 |
| TRIAL JUDGE: | HON. ROBERT G. EVANS |
| COURT FROM WHICH APPEALED: | SIMPSON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | VINCENT CARACCI |
| ATTORNEYS FOR APPELLEES: | MARK P. CARRAWAY |
| | WHITMAN B. JOHNSON III |
| | STEVE KRUGER |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | AFFIRMED - 4/10/97 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 8/29/97 |

**EN BANC.**

**SMITH, JUSTICE, FOR THE COURT:**

On March 15, 1988, Mary Lou Brown felt two small lumps on the inner portion of the underside of her left breast. Later that day, she went to the offices of Dr. Dennis Adams, a family practitioner. Although she told the nurse/receptionist that the chief complaint was lumps in her breast, the nurse/receptionist wrote down that Mary Lou was complaining of pain in her left breast. The lumps were not then, nor had they ever been painful, and Dr. Adams' actions were contrary to the minimal standard of care in his treatment of the lumps because he acted in a manner inconsistent with the accepted treatment of a complaint of breast lumps which is sufficient to present a symptom of breast cancer. He did so by sending Mary Lou to Simpson General Hospital, a facility which was only equipped to do screening mammograms, when the proper treatment would have been to send her to a

facility which was capable of doing diagnostic mammograms to locate the source of her complaint.

Simpson General Hospital only performed screening mammograms, not diagnostic mammograms. Dr. Adams knew as much at the time that he sent her to Simpson General Hospital for the mammogram. Dr. Adams also admitted that if Mary Lou complained to anyone in his office of lumps, then the level of care that he administered was inadequate because he acted in a manner inconsistent with a complaint of breast lumps.

When Mary Lou arrived at the hospital, she was x-rayed by an x-ray technician. Dr. Berrong, the radiologist, then took the x-rays, read them and sent a report to Dr. Adams in which he stated that there was no cause for alarm from anything that he could read in this x-ray.

Dr. Adams informed Mary Lou not to worry and recommended no follow-up visitation. In the summer of 1991, Dr. Sherry Meadows examined a lump that had developed in Mary Lou's left breast over the course of the past year. That lump was apparently nine centimeters, or about three to four inches, in diameter, and was located in the upper outer portion of the breast. The mass was diagnosed as a malignant stage III tumor and Mary Lou started a regimen of seven chemotherapy treatments to reduce the tumor to an operable size. As a stage III cancer patient, she has approximately a fifty percent prospect of surviving through 1997.

## STANDARD OF REVIEW

At the conclusion of the plaintiff's proof in a medical malpractice case, upon motion of the defendant for a directed verdict, the trial court is required to consider the evidence in a light most favorable to the plaintiff, considering the testimony in behalf of the plaintiff to be true along with all favorable inferences that may be drawn therefrom, and evidence of contradiction thereof must not be considered. *Ladner v. Campbell,* 515 So. 2d 882, 887 (Miss. 1987).

## DISCUSSION OF LAW

*Hall v. Hilbun*, 466 So. 2d 856, 873 (Miss. 1985), defined a physician's nondelegable duty of care as follows:

> Given the circumstances of each patient, each physician has a duty to use his or her knowledge and therewith treat through maximum reasonable medical recovery, each patient, with such reasonable diligence, skill, competence, and prudence as are practiced by minimally competent physicians in the same specialty or general field of practice throughout the United States, who have available to them the same general facilities, services, equipment, and options.

To present a *prima facie* case of medical malpractice, a plaintiff, after establishing a doctor-patient relationship and its attendant duty, is generally required to present expert testimony identifying and articulating the requisite standard of care and establishing that the defendant physician failed to live up to that standard of care in some causally significant respect. *Boyd v. Lynch*, 493 So. 2d 1315, 1318 (Miss.1986). In addition, the plaintiff must prove the extent of her damages. *Ladner v. Campbell*, 515 So. 2d at 887-88.

Mary Lou Brown alleges several points of error which all boil down to one thing: should the trial judge have disallowed the testimony of Dr. Elliott. The trial court articulated four reasons to the to

the jury to explain why he was taking the case from them. Most significant, and the reason which we uphold as sufficient to affirm as to all defendants is:

> **DR. ELLIOTT WAS NOT ABLE TO STATE WITHIN A REASONABLE DEGREE OF MEDICAL CERTAINTY OR PROBABILITY THAT THE ALLEGED NEGLIGENCE ON THE PARTS OF DOCTORS ADAMS AND BERRONG PROXIMATELY CAUSED OR CONTRIBUTED TO THE PLAINTIFF'S DAMAGES.**

*Ladner v. Campbell* states:

> In cases of this nature . . . proof of causation does not require that it be shown that the patient was certain to have recovered or improved with sound medical care, . . . [T]he plaintiff may sustain the burden of establishing proximate causation with evidence that it was probable, or more likely than not, that the patient would have been helped by proper treatment. . . .

*Ladner v. Campbell* at 515 So. 2d 888, *quoting* 54 A.L.R.4th 10 § 2 [a] (1987). In *Harris v. Shields*, 568 So. 2d 269, 273-74 (Miss. 1990), this Court stated:

> We cannot know with certainty the results of what was not done if it had been done. A measure of speculation is inherent in any causation inquiry in a malpractice case. On the other hand, we have insisted that proof of causation remain within the realm of the reasonably probable and condemn the merely speculatively possible. *Burnham v. Tabb,* 508 So. 2d 1072, 1074 (Miss. 1987); *Pittman v. Hodges*, 462 So. 2d [330], at 334-35 . . . .

> ". . . .Adequate proof of proximate cause in a medical malpractice action of this type requires evidence that in the absence of the alleged malpractice, a [significantly] better result was probable or more likely than not." [*Ladner v. Campbell*, 515 So. 2d at 888.](citing 54 A.L.R.4th § 4.)

As those standards apply to this case, it is clear from the testimony of Dr. Elliott that the level of causation never got past the speculatively possible. He never stated that but for the malpractice alleged on the parts of Dr. Adams and Dr. Berrong, a better prognosis for Mary Lou would have been probable or more likely than not. As a matter of fact, Dr. Elliott flatly refused to speculate on the chance that Mary Lou's breast might have been saved, and made no speculation on the chances of catching the cancer in an earlier stage of development by diagnosing it in 1988 other than to say that "[T]here's a possibility."

The trial judge correctly held that there was no evidence given to a reasonable probability or medical certainty that any negligence of the defendant physicians proximately caused Mary Lou's damages was specifically that Dr. Elliott could not state that the discovery of a carcinoma in 1988 would have saved Mary Lou's breast. We decline to deviate from our established standard requirement of "the realm of reasonably probable" evidence of causation. *Harris*, 568 So. 2d 273-74. We, therefore, affirm the trial judge.

## CONCLUSION

This Court holds that because of the failure on the plaintiff's part to demonstrate within a reasonable degree of medical certainty or probability that the alleged negligence on the part of the defendant

physicians caused her damages, the judgment of the trial court is affirmed. Furthermore, we also find that there was no evidence that Simpson General Hospital was negligent independent of any actions on the part of Dr. Berrong. As a result we affirm the judgment of the trial judge as to all three defendants.

**JUDGMENT AFFIRMED.**

**LEE, C.J., PRATHER, P.J., ROBERTS AND MILLS, JJ., CONCUR. SULLIVAN, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY PITTMAN, AND McRAE, JJ. McRAE, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY SULLIVAN, P.J., AND BANKS, J.**


### SULLIVAN, PRESIDING JUSTICE, DISSENTING:

The majority concludes that a directed verdict in favor of the defendants was appropriate in this case, because Mary Lou Brown did not put on sufficient proof of causation to take her case to the jury. I disagree, and therefore must respectfully dissent.

The majority correctly states that in order to present a prima facie case, a medical malpractice plaintiff must present evidence of a doctor-patient relationship, the requisite standard of care, failure of the defendant doctor to meet that standard of care in a causally significant manner, and extent of damages. *Boyd v. Lynch*, 493 So.2d 1315, 1318 (Miss. 1986); *Ladner v. Campbell*, 515 So.2d 882, 887-88 (Miss. 1987). Here, there is no dispute that a doctor-patient relationship existed between Ms. Brown and both Dr. Adams and Dr. Berrong. Ms. Brown presented sufficient evidence to establish that the standard of care required that upon complaint of breast lumps, the attending physician should administer a diagnostic mammogram. Ms. Brown testified that she informed Dr. Adams's nurse/receptionist that she had found lumps in her left breast. However, Dr. Adams sent Ms. Brown to Simpson General Hospital for a screening mammogram instead of a diagnostic mammogram. According to the testimony of both Dr. Adams and Ms. Brown's expert, Dr. Elliott, this failure constituted a breach of the standard of care. Ms. Brown clearly had damages in the form of her lost breast, and more importantly the loss of her life, since she has only a fifty percent chance of surviving through 1997.

The majority determines that Ms. Brown's evidence of causation never passed the level of the speculatively possible, and therefore did not meet the requirement of "the realm of the reasonably probable." *Harris v. Shields*, 568 So.2d 269, 273-74 (Miss. 1990). However, Dr. Elliott testified that the lumps detected in 1988 were related to the cancer diagnosed in 1991, and that the cancer had originated in the lower part of Ms. Brown's left breast, where the lumps she found were located. This testimony established that Dr. Adams's breach of the standard of care was causally significant. Based upon Dr. Elliott's testimony, the jury could have inferred that Ms. Brown's breast could have been saved and/or that her life might have been saved or at least prolonged by earlier detection and treatment.

Furthermore, in some cases expert testimony is not required to establish negligence in a medical malpractice suit, if the jurors would understand on their own that the actions of the defendant doctor constituted negligence. *Phillips v. Hull*, 516 So.2d 488, 494 (Miss. 1987) (issue of informed consent

did not require expert testimony); ***Hammond v. Grissom***, 470 So.2d 1049, 1053-55 (Miss. 1985) (expert testimony not required where evidence showed that decedent received no medical treatment at the hospital for two hours); ***Rural Educational Ass'n v. Bush***, 42 Tenn. App. 34, 47-48, 298 S.W.2d 761, 768 (1956) (expert testimony was not necessary to establish that leaving a sponge in the plaintiff's body following surgery was negligence); ***Jeanes v. Milner***, 428 F.2d 598, 604-605 (8th Cir. 1970) (evidence of a one-month delay in delivering specimen slides for diagnosis of cancer was sufficient to establish proximate cause without expert testimony to that effect). "[O]ur general rule is that medical negligence may be established only by expert medical testimony, with an exception for instances where a layman can observe and understand the negligence as a matter of common sense and practical experience." ***Erby v. North Miss. Medical Ctr.***, 654 So.2d 495, 500 (Miss. 1995). The media bombards us with the message that early detection of cancer is vital for effective treatment and survival. Our doctors impress upon us the need for preventive measures, including monthly self breast exams and routine mammograms for women, to increase the chances of early detection and survival. Common sense should tell us that the three-year delay between Ms. Brown's detecting the lumps in her breast and the diagnosis of cancer caused an increased risk of loss of life. I therefore find that Ms. Brown established her prima facie case for medical malpractice, including the element of causation, by presenting sufficient evidence for her case to be submitted to the jury.

## CONCLUSION

I cannot agree with the majority's conclusion that there was insufficient evidence of proximate causation to allow this case to go to the jury. Therefore, I must respectfully dissent. I would reverse the directed verdict in favor of the defendants and remand the case to the Simpson County Circuit Court for a new trial.

**PITTMAN AND McRAE, JJ., JOIN THIS OPINION.**

**McRAE, JUSTICE, DISSENTING:**

I agree with the majority's finding that Dr. Adams breached the standard of care in failing to pursue more aggressive diagnostic measures when Mary Lou Brown first came to see him in 1988 about the lumps on her breast. However, I disagree with its conclusion that, applying the standards set forth in ***Harris v. Shields***, 568 So. 2d 269, 273-274 (Miss. 1990), Dr. Elliott's testimony regarding causation did not go beyond the "speculatively possible." The case, therefore, should not have been taken from the jury. Accordingly, I dissent.

***Harris*** requires that proof of causation stay within the ambit of the "reasonably probable" and that the evidence show that "in the absence of the alleged malpractice, a [significantly] better result was probable or more likely than not." ***Id.*** (quoting ***Ladner v. Campbell***, 515 So. 2d 882, 888 (Miss.1987)). Clearly, Dr. Elliott's testimony went beyond the "speculatively possible," as the majority terms it, to establish that but for the negligence of both Dr. Adams and Dr. Berrong, the radiologist, there would have been a better prognosis for Mary Lou Brown. Looking, as we must, at all of the evidence and inferences that may be drawn therefrom in a light most favorable to Brown, the non-moving party, Dr. Elliott's testimony most certainly enables her case to survive the directed

verdict test. *Wallace v. Thorton,* 672 So. 2d 724, 727 (Miss. 1996).

Dr. Elliott, after indicating that Dr. Berrong should have advised Dr. Adams that the 1988 mammogram could not be relied on because of the breast density as well as the patient's age and the pain she had experienced, stated in his deposition that:

> So I feel that Dr. Berrong was negligent in conferring that back to Dr. Adams. So I think there's been a lack of communication from the doctors to each other, and the patient was right in the middle. That's where I feel this tragedy happened.
>
> I feel, also, that even though Dr. Adams got this report and I would have been relieved, and it's certainly not his responsibility, in my opinion, to have known from that to order anything else, that is the area of the radiologist, in my opinion, that he should have still said we don't have anything right now, but maybe you should come in in three or four months and let's examine you, because if you keep having pain or you develop a lump, we need to know about it.
>
> BY MR. CARACCI:
>
> Q. Dr. Elliot, do you have an opinion as to whether Dr. Berrong's and Dr. Adam's failure to communicate, as you just described, failure to follow-up on Mary Lou Brown's condition and progress, resulted in any harm to her?
>
> A. I have an opinion.
>
> Q. What is that?
>
> A. I think they failed to diagnose her breast cancer.
>
> Q. Dr. Elliott, do you have an opinion as to whether Mary Lou Brown's cancer should have been detected at an earlier stage?
>
> A. Yes.
>
> Q. What is that opinion?
>
> A. I think it should have been.

Dr. Elliot then testified that he did not have an opinion as to whether earlier detection would have saved Brown's breast, since the nature of the cancer, "a diffuse invasive process" versus "a definite three-dimensional lump," determines whether a patient is a candidate for breast conservation. Dr. Elliot's testimony concluded:

> Q. Okay. One final question, Dr. Elliott. What would have been the - at least one of the primary benefits of early detection of breast cancer in regard to Mary Lou Brown as that relates to her chances for survival?
>
> A. Well, I think that any time you can diagnose a breast cancer, the earlier your diagnosis, usually the better the stage of the disease and the less chance for patient survival. I think that if there was a three-year delay in diagnosis, this obviously decreases her - it's going to increase her

chances of dying of disease.

Q. I don't know if I understood you. But maybe I misheard. But the earlier you detect the cancer, the better the chance for survival, is that correct?

A. That's usually the case, yes, sir.

Dr. Elliott's testimony clearly establishes that it was "reasonably probable" that Mary Lou Brown's prognosis would have been significantly better had Drs. Adams and Berrong not failed to diagnosis breast cancer or take further diagnostic measures in 1988 when her symptoms first appeared. His refusal to speculate as to whether her breast could have been saved was based not on the timeliness of the diagnosis, but because breast conservation is contingent upon the nature of the malignancy. Moreover, the real issue is not whether Brown's breast could have been saved, but whether her chances of surviving the disease could have been increased. Dr. Elliott clearly established that Brown's chances of dying were increased by her physicians' failure to take earlier action. Accordingly, a directed verdict should not have been granted and the matter should have gone to the jury for its consideration. I therefore dissent.

**SULLIVAN, P.J., AND BANKS, J., JOIN THIS OPINION.**