ROBERTS, J.,
for the Court.
PROCEDURAL HISTORY
¶ 1. Gary D. Nelson, and his wife under a loss of consortium claim, sued Sanderson Farms, Inc. on December 31, 2002, alleging that Sanderson Farms, Inc. failed to provide a safe place to work and warn him of a dangerous condition. On November 22, 2003, by agreement of all parties, Sand-erson Farms, Inc. was dismissed and replaced by Sanderson Farms, Inc. (Processing Division) (“Sanderson Farms”). On August 5, 2004, Sanderson Farms filed its motion for summary judgment. After hearing arguments, the Circuit Court of Jones County granted the motion on the grounds that Nelson’s injury was intimately connected or arose from the work they were hired to perform and that Nelson knew of the potential danger created by the bridge. Aggrieved by this, Nelson now appeals.
FACTS
¶ 2. On October 10, 2002, Nelson arrived at Sanderson Farms’ processing facility in McComb, Mississippi as an employee of Paul Przeracki d/b/a Cobra Industrial. Sanderson Farms hired Cobra as an independent contractor to repair a leak in an underground air pipe which supplied air to a waste-water aeration basin at Sanderson Farms’ McComb facility. The contract provided, in pertinent part, that Cobra would “supply all labor, materials, equipment, supplies, facilities, transportation, and supervision necessary to pump out water out of 12" pipe ... ”. The aeration basin itself was much like an above-ground swimming pool. The wall of the basin was approximately four and one-half feet high and nine inches thick. A blower located roughly five feet to the side of the basin was connected to the center bottom of the basin by the faulty air pipe which ran between the two points roughly fifteen to seventeen feet underground and angled up to each point. A “bridge,” which ran from the middle of the basin and extended to the outer edge, slowly rotated above the water in the basin. The outer end of the bridge was supported by a wheel which rested on top of the outer wall of the basin. It took roughly three minutes for the “bridge,” and attached wheel, to make a full rotation around the basin, and all testimony indicated that the wheel was virtually silent during its movement.
¶ 3. The leak Cobra was hired to repair was believed to be underground, prior to where the pipe angled up to connect to the aeration basin. Cobra’s plan to repair the leak involved driving a smaller pipe into the ground with a sledge hammer and air drill, down to the location of the leak, and injecting a chemical compound through the smaller pipe which would seal the leak.
¶ 4. Przeracki and Nelson, the only Cobra representatives present the day of the *48 injury, arrived at the site around 11:00 in the morning. Also present was Dwight Pettit, a representative of the company that manufactured the compound Cobra planned to use to stop the leak, and George Jones, Jr., Sanderson Farms’ facility supervisor. Przeracki and Nelson were taking turns hammering the pipe into the ground and were located in the five foot gap between the basin and the blower. They were not working on the basin or rotating bridge itself, but were in close proximity to it. Nelson stated in his deposition that when they began to work the bridge was rotating around the top of the basin and he identified it as a potential hazard, but that around 1:00 p.m. he noticed it was shut off. Specifically, Nelson stated in response to an interrogatory offered by Sanderson Farms:
While installing the small bore pipes, pipes we would pump the grout through, we hit the footer, concrete, and stopped driving. Paul and I went to the control room and ask for drawings. After being given the civil drawings that showed the footer, I went back to the site to lay out the location of the footers. Paul came back and started pulling the cover from a pump enclosure. The operator (whom we presume was George Jones, Jr.,) was present. I asked Paul if he was sure the pump was locked out and he told me the operator had thrown the breaker. A few minutes later I noticed the boom appeared to be stopped. I remember making the statement, “at least they shut off the boom.” Paul and the grout representative, Dwight Pettit, were both standing there. Paul said that he did not know why the boom was left running anyway. The other times Paul had worked in this exact location, Sanderson Farms had stopped the boom from operating. After pulling the pipe up we had hit the footer with, we were driving it in another location. Paul and I were taking turns driving the pipe down with a sledge hammer. I finished my turn, stepped back placing my hand on top of the tank and seconds later, the boom ran over my hand.
Also, during his deposition, Nelson made the following supporting statement:
Q. Okay. What’s the basis of your recollection that it was turned off at some point?
A. I saw it stopped.
Q. About what time was that?
A. About the time we were pulling this panel off in that same area there.
Q. Did you make a comment about that?
A. Yes, sir, I did.
Q. And what did you say?
A. I said, well, at least they turned that thing off.
Jones testified that he was positive the bridge was never shut down while Nelson and the others were working, and that he had been observing the trio most of the morning but was in his office using the restroom at the time of the accident. Additionally, Jones testified that had the bridge been shut down, he would have been the one to do it. Przeracki testified that the bridge was rotating when they arrived at the work site and he could not recall the bridge ever stopping. The only other individual present that day, Pettit, testified in his deposition as follows:
Q. At the time the camera was placed in there, do you know if the wheel was running?
A. I believe it was.
Q. At any point in time between the time that you got there and Gary Nelson was injured, do you know whether or not the bridge was shut down?
*49 A. Well, this is hard for me to remember, but it only makes sense that it was shut down before they blew the water out of this thing. They shut it down for some reason when they turned this blower on and the water all come out of the middle. And that was — whenever they took the thing back off, I mean, it went back around.
Q. How many times did that happen?
A. Three maybe.
[[Image here]]
Q. And so at that point what is it you’re doing?
A. I am running or helping run and operate the pump, making sure that the lines sent down — the pipe and at the point, turn the pump on and watch and supervise the grouting operation, the pumping of the material.
Q. And did that resolve the problem?
A. Not initially.
Q. When you say “not initially,” what do you mean?
A. That had to be done two, maybe three times. And we had to reposition — once we pumped the grout, then that’s when they had to put everything back on the pipe, blow this line out. That’s when the water comes up. That’s when I — as I recall the bridge was stopped.
[[Image here]]
Q. All right. Do you have any specific recollection that the bridge and wheel ever stopped moving from the time that y’all arrived in the morning until the time of Mr. Nelson’s injury?
A. Not specific.
Q. Okay.
A. I think that — -because it only makes sense for us to inspect that and look into it that it had to have gone off at least once.
¶ 5. Nelson’s injury occurred between 1:00 p.m. and 1:15 p.m. During a break from swinging the sledgehammer, Nelson placed his hand on top of the basin wall. As was previously stated, he believed that the bridge had been stopped. Within a few seconds, the wheel rolled over his fingers, causing substantial damage to Nelson’s left hand, and eventual amputation of three fingers.
STANDARD OF REVIEW
¶ 6. A lower court’s grant of summary judgment is reviewed de novo. McMillan v. Rodriguez, 823 So.2d 1173, 1177(¶ 9) (Miss.2002). If, after examining all evidentiary matters within the record in a light most favorable to the non-movant, no genuine issue of material fact exists, then summary judgment is proper. Id. Additionally, the non-movant is to be afforded every reasonable doubt when reviewing the record. Jones v. James Reeves Contractors, 701 So.2d 774, 777 (Miss.1997). A summary judgment motion can only stand if there is no genuine issue of material fact, and, as a matter of law, the moving party is entitled to relief. Id. “If reasonable minds could differ on a material fact, summary judgment is improper.” Hall v. Cagle, 773 So.2d 928(¶ 4) (Miss.2000) (citing Stegall v. WTWV, Inc., 609 So.2d 348, 350-51 (Miss.1992)). Finally, summary judgment should not be granted when a complete presentation of the evidence would lead to a triable issue. Id. (citing Great Southern [National] Bank v. Minter, 590 So.2d 129, 135 (Miss. 1991)).
ISSUES AND ANALYSIS
¶ 7. Nelson argues that the lower court’s grant of summary judgment in favor of *50 Sanderson Farms was in error. Finding that genuine issues of material fact do exist surrounding the details of the case before us, we must reverse.
I. Whether the trial court erred in finding that no genuine issue of material fact existed as to whether or not the “intimately connected” exception applied.
¶ 8. Generally, a premises owner has a duty to provide an independent contractor, and the employees of the independent contractor, with a “reasonably safe place to work or give warning of danger.” Ratcliff v. Georgia Pacific Corp., 916 So.2d 546, 549(¶ 10) (Miss.Ct.App.2005) (citing Mississippi Chemical Corp. v. Rogers, 368 So.2d 220, 222 (Miss.1979)). As an exception to this general rule, the premises owner has no duty to make safe or warn of dangers that arise out of or intimately connected with the contracted work. Coho Resources, Inc. v. McCarthy, 829 So.2d 1, 11(¶ 21) (Miss.2002) (citing Magee v. Trans Continental Pipeline Corp., 551 So.2d 182, 185 (Miss.1989)). Stated another way, a premises owner has no duty to protect independent contractors, or employees of the independent contractor, from dangers intimately connected with defects which the contractor has undertaken to repair. Jones v. James Reeves Contractors, Inc., 701 So.2d 774, 782 (Miss.1997) (citing Jackson Ready-Mix Concrete v. Sexton, 235 So.2d 267, 271 (Miss.1970)).
 ¶ 9. Under the “intimately connected” exception, “[w]hat is critical is whether the project owner maintains any right of control over the performance of that aspect of the work that has given rise to the injury.” Magee v. Trans Continental Pipeline Corp., 551 So.2d 182, 186 (Miss.1989). Under most situations, the contract language is of utmost import in this regard, but if the plaintiff can show that, notwithstanding the contract, the premises “owner maintained substantial de facto control over those features of the work out of which the injury arose,” the premises owner’s duty is resurrected. Id. Thus, there is an exception to the “intimately connected” exception of premises liability with regard to independent contractors which reinstates a duty to provide a reasonably safe place to work or warn of dangers. As correctly identified in Stokes v. Emerson Electric Co., 217 F.3d 353, 358 (5th Cir.2000), the intimately connected exception credits the independent contractor, and his employees, with knowledge of the dangers closely related to the job they have undertaken. This knowledge on the part of the independent contractor is rightly assumed because of its “familiarity with the work site and expertise in how to safely accomplish the project.” Stokes, 217 F.3d at 358.
¶ 10. The trial court determined that Nelson’s injury arose from or was intimately connected to “the very work they were hired to perform.” Notwithstanding that holding, we turn to the discussion of the exception within the exception, control, which the lower court failed to consider. In the case at hand, the contract between Cobra and Sanderson Farms explicitly gave control over sup-pling all “labor, materials, equipment, supplies, facilities, transportation, and supervision necessary to pumpout water out of 12" pipe ...” to Cobra and provided a fixed, lump sum cost to Sanderson Farms for said services. Additionally, the record indicates that Cobra had full control over the way in which the job was to be completed, i.e., hammering a pipe into the ground, etc., and no one from Sanderson Farms was contractually charged with the responsibility of supervising the operation. Cobra’s apparent control over the work itself notwithstanding, a question exists *51 whether Sanderson Farms retained direct, unfettered control over the aeration basin and its accompanying rotating bridge. As the Nelsons point out, the contract is silent as to which party maintained control over the bridge’s operation, and it is safe to assume that Sanderson Farms retained the control it already possessed. Additionally, Jones testified that if anyone would have shut down the bridge, it would have been him, serving as further evidence that Sanderson Farms did not relinquish control of the bridge to Cobra. On the other hand, testimony was given that Przeracki may have had the ability to request the bridge be shut down, indicating that Sand-erson Farms may have given Cobra some control over the bridge. Therefore, we find that a genuine issue of material fact exists as to whether Sanderson Farms retained substantial control over the job site.
¶ 11. Nelson argues that Sanderson Farms’ lockout/tagout policy is evidence of their control over the entire area of the work site. The policy requires that a machine or piece of equipment be locked out and tagged out “if servicing and maintenance takes place during normal production operations which requires an employee to place any part of their body into an area on a machine or piece of equipment that is the point of operation or a danger zone.” This policy was also applied to contractors, such as Przeracki and Nelson. Nelson urges that the plain language of this policy obviously describes the area where Nelson was injured. We cannot agree. The plain language of the policy demands lockout/tagout only if there is service and maintenance that requires contact of an area on a machine or piece of equipment. No testimony was given indicating that contact with the basin, bridge or wheel was required to complete the contracted job. Scott Rushing, Sanderson Farms’ manager of safety, did testify that the terms and conditions of the lockout/tagout procedure applied to the waste water basin. This is similar to saying the lockout/tagout procedures applied to the facility as a whole, which we assume they did, but as stated above, the conditions triggering enforcement of the procedure did not arise. So, while there is a genuine issue of material fact as to whether or not Sanderson Farms retained substantial control over the instrumentality giving rise to the injury, we find that Sanderson Farms’ lockout/tagout policy is not evidence of control as it did not apply to the basin or bridge at the time Nelson was working at the site.
II. Whether Nelson knew that the bridge represented a danger.
¶ 12. The trial court’s second basis for granting Sanderson Farm’s motion for summary judgment is that Nelson knew the potential danger posed by the bridge, and, therefore, Sanderson Farms cannot be held liable. In response to this, Nelson argues that Sanderson Farms’ alleged act of shutting down the bridge, then restarting it, created a “hidden danger,” to which Sanderson Farms had a renewed duty to warn.
¶ 13. A second exception to the general rule establishing a premises owner’s duty owed to an independent contractor, and the independent contractor’s employees, states that the premises owner’s duty to warn of dangers is absolved if the independent contractor knows of said dangers. Ratcliff v. Georgia Pacific Corp., 916 So.2d 546, 549(¶ 10) (Miss.Ct.App. 2005). Stated another way, a premises owner has a duty to warn of unknown dangers. Any knowledge of dangers on the part of the independent contractor is deemed to be known by the contractor’s employees as well. Jones, 701 So.2d at 783.
¶ 14. There was ample testimony in the record that showed Nelson appreciated the *52 potential danger created by the bridge’s rotation. Nelson does not argue this point. Jones even testified that both he and another Sanderson Farms’ employee had been physically injured by the rotating bridge prior to Nelson’s injury. The question becomes, then, if the bridge was ever turned off. The record is ripe with contradictory testimony to this point. Nelson testified that he noticed the bridge was moving when they arrived at the facility that morning, but sometime around 1:00 p.m. noticed it was not moving. Pettit bolsters this testimony by stating in his deposition that it would have only made sense to shut down the bridge at least once given the work they were doing. On the other side of the fence, Jones adamantly stated that he never shut down the bridge that day, but was in his office at the time of the accident, while Przeracki testified he could not recall the bridge ever stopping. On summary judgment, we are required to accept all evidence and inferences favorable to the plaintiffs case as true. Harris v. Shields, 568 So.2d 269, 275 (Miss.1990).
¶ 15. The Appellee argues that its duty to warn was abated whether or not the bridge was stopped and started again because Nelson knew of the danger the bridge created, and while he did testify that the noticed the bridge stopped, he was never informed of the bridge being stopped, therefore, Nelson could not have justifiably relied on his belief that it was turned off without also presuming that it may be turned back on without his knowledge. While the argument is creative, it is not persuasive. If the bridge was halted while the Cobra crew was working, which we must assume given Nelson’s testimony and the pertinent standard of review, the danger created by the bridge was also halted, and Sanderson Farms’ duty to warn would be renewed if Jones restarted it, as at that point in time the bridge’s movement would have been an unknown danger. Therefore, a genuine issue of material fact exists as to whether the bridge was shut down and restarted unbeknownst to Nelson and whether or not a de-ener-gized bridge, under the circumstances present, represented a hidden danger about which Sanderson Farms had a duty to warn before re-energizing. These issues are properly jury issues.
¶ 16. Given our findings, supra, that genuine issues of material fact exist regarding control over the work site and the alleged stopping and restarting of the bridge, consideration of Nelson’s other arguments in favor of reversal of the lower court’s grant of summary judgment, namely whether Sanderson Farms was in the best position to eliminate the potential hazard the bridge created and whether Sand-erson Farms negligently caused Nelson’s injuries, is not necessary for resolution of this appeal.
CONCLUSION
¶ 17. Based upon the evidence in the record viewed in the most favorable light to Nelson, and giving Nelson every reasonable doubt, we hold that there are genuine issues of material fact that must be addressed by a jury. The decision of the Circuit Court of Jones County to grant Sanderson Farms’ motion for summary judgment is, therefore, reversed and remanded.
¶ 18. THE JUDGMENT OF THE CIRCUIT COURT OF JONES COUNTY IS REVERSED AND REMANDED. All COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.
KING, C.J., LEE AND MYERS, P.JJ., SOUTHWICK, IRVING, CHANDLER, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR.